GRAHAM ET AL., APELANTES, *v.* CROSAS ET AL., APELADAS.

APELACIÓN procedente de la Corte de Distrito de San Juan,
Sección 1ª.

No. 652.—Resuelto en marzo 5, 1913.

APELACIÓN—ESPECIFICACIÓN DE ERRORES.—Cuando al exponer uno de los motivos
que sirven de fundamento al recurso de apelación, o sea el relativo a haberse
cometido ·error en la apreciación de las pruebas, no se plantea un debate
judicial fijo, concreto y determinado, sino que ese debate se reserva para
cuando se puntualicen los demás errores de la sentencia apelada, este tribunal
carece de base para discutir aisladamente un error alegado en esa forma.

CONTRATOS—SIMULACIÓN—PRUEBAS.—No se ha probado en este caso que la escri-
tura por la que Don Rafael Margari vendió a Don Andrés Crosas la parti-
cipación que tenía en la sociedad Margari & Co., en liquidación, fuera simu-
lada, pues entraña un acto conforme a la realidad de los hechos.

ID.—SIMULACIÓN—PRUEBAS.—Tampoco se ha demostrado la simulación o nulidad
de las escrituras por las que Don Rafael Margari vendió a la sociedad mercantil
Crosas y Finlay, representada por su socio gestor Don Andrés Crosas, tres
solares Nos. 6, 11 y 12 radicados en el barrio de la Marina de esta ciudad,

pues aunque dichos solares figuraban a nombre de Don Rafael Margari, pertenecían a Margari & Co., y por tanto, no había dificultad legal en que Don Rafael Margari los traspasara directamente a Crosas & Finlay en lugar de traspasarlos a Margari & Co. para que ésta los trasmitiera a Crosas y Finlay.

TUTOR—NOMBRAMIENTO NULO—LEY 31 DE TORO.—Cuando una persona nombra a otra apoderado comisario para hacer testamento en nombre de aquélla, de acuerdo con la ley 31 de Toro, o sea la ley 1ª., título 19, libro 10 de la Novísima Recopilación, y al mismo tiempo le designa tutor y curador *ad bona* de un hijo, no puede dicho comisario hacer extensivo el nombramiento a una hija póstuma del mismo poderdante, cuando del poder no consta tal facultad.

ID.—PARTICIÓN DE BIENES.—La nulidad del nombramiento de un tutor y curador *ad bona*, que no interviene en tal concepto en la partición de bienes del difunto, no afecta la validez de dicha partición.

ID.—INCUMPLIMIENTO DE LOS REQUISITOS PARA EL DISCERNIMIENTO DEL CARGO.—En un caso en que el tutor no había de prestar fianza por haber sido relevado de ella y el desempeño del cargo había de entenderse frutos por pensión, no era necesario dar cumplimiento a los preceptos del artículo 1261 del Código de Enjuiciamiento Civil Español de 1855 antes de discernir el cargo.

ID.—OBLIGACIÓN DEL FIEL DESEMPEÑO DEL CARGO.—La omisión por parte del tutor de otorgar la obligación de desempeñar bien y fielmente los deberes de su cargo, no es un defecto de carácter sustancial, que vicia de nulidad el discernimiento del cargo, ni exime al tutor de la responsabilidad aneja al ejercicio de la tutela.

CURADOR AD LITEM—INCOMPATIBILIDAD DE INTERESES.—De acuerdo con el artículo 1852 del Código de Enjuiciamiento Civil que empezó a regir en Puerto Rico en enero 1 de 1886, cuando el tutor no puede representar a los menores en una partición de bienes por ser incompatibles los intereses de ambos, procedía el nombramiento de un curador *ad litem*.

ID.—IMPUGNACIÓN.—Es tardía la impugnación del discernimiento del cargo de un curador *ad litem* cuando ya éste ha desempeñado dicho cargo y ha cesado en el mismo después de aprobada la partición de herencia, y también dicha impugnación es ilegal cuando se hace sin audiencia del interesado.

MANDATO—TESTAMENTARÍA.—El mandato otorgado a favor de una persona para promover por todos los trámites legales una testamentaría y practicar en general todos los actos y diligencias que le fueran inherentes hasta el completo término del juicio testamentario, comprende facultades bastantes para arreglar extrajudicialmente la partición de herencia cuando los actos del poderdante revelan que esa fué su intención.

PARTICIÓN DE HERENCIA—APROBACIÓN POR LOS INTERESADOS.—Lo convenido en una partición de herencia aprobada judicialmente es ley para los interesados debidamente representados en la misma.

SOCIEDAD—LIQUIDACIÓN—MENORES.—Cuando en la liquidación de una sociedad mercantil los menores interesados en la misma y debidamente representados por un curador *ad litem* son perjudicados en dicha liquidación, tienen el derecho de reclamar contra dicho curador antes o después de llegar a la mayoría de edad, de acuerdo con el artículo 234 del Código de Comercio.

PARTICIÓN DE HERENCIA—NEGLIGENCIA DEL ALBACEA—CUENTAS INCOBRABLES.—Cuando por negligencia de un albacea, una cuenta se hace incobrable, tal

negligencia puede constituir una acción contra dicho albacea, pero no puede afectar la validez de la partición de la herencia en que figura la cuenta.

PRESCRIPCIÓN—NULIDAD DE CONTRATOS—MENORES.—De acuerdo con el artículo 1268 del Código Civil Revisado, reproducción del 1301 del Código Civil antiguo, la acción de nulidad de contratos en los casos a que se refiere dicho artículo, sólo dura cuatro años, cuyo término en lo que respecta a menores empieza a contarse desde que llegan a la mayoría de edad. Este término de prescripción es el mismo para las acciones de rescisión de partición de herencia.

Los hechos están expresados en la opinión.

Abogado de los apelantes: *Sr. Antonio Sarmiento.*

Abogado de los apelados: *Sr. Juan Hernández López.*

EL JUEZ PRESIDENTE SR. HERNÁNDEZ, emitió la opinión del tribunal.

Con fecha 14 de noviembre del año 1908 los demandantes Elena Graham O'Brien, Andrés B. Crosas Graham y Eduarda de los mismos apellidos, como componentes de la Sucesión de Eduardo E. Crosas O'Ferral, presentaron demanda ante la Corte de Distrito de San Juan contra Andrés Crosas O'Ferral y Rafael Margari, en la que después de consignar los hechos que estimaron conducentes a sus pretensiones, formularon éstas por medio de súplica que copiada a la letra dice así:

"Suplican a la corte que dé sentencia contra los demandados en la que declare nulos: las ventas hechas por Rafael Margari a Andrés Crosas y O'Ferral de la participación en la liquidación de Margari y Cía., y a Crosas y Finlay de los solares números 6, 11 y 12 de la Marina de esta capital; el nombramiento de tutor y curador *ad bona* de Eduarda Crosas Graham a favor del citado Andrés Crosas; y el discernimiento del cargo de tutor y curador *ad bona* de Andrés Bernardino Crosas Graham hecho a favor de Crosas; el nombramiento y discernimiento de la curaduría ejemplar de los mismos menores hecha a favor de Benigno Trueba y la partición de bienes hereditarios de Eduardo E. Crosas hecha por el citado Andrés Crosas como albacea con la conformidad de Miguel Sainz y Benigno Trueba y disuelta la comunidad de bienes que, liquidada Margari y Cía. resultó entre Andrés Crosas O'Ferral y la Sucesión de Eduardo Crosas O'Ferral y ordene; que se lleve a cabo la disolución de esa comunidad en la forma que la ley determina para las particiones; que se

cancelen las inscripciones que en el registro de la propiedad hayan causado la trasmisión a Crosas y Finlay de la propiedad de los solares 6, 11 y 12 de la Marina de esta capital y de éstos a Andrés Crosas; que el albacea partidor y administrador de los bienes hereditarios de Eduardo E. Crosas rinda cuenta de su administración hasta la fecha y que lleve a cabo la partición de los dichos bienes hereditarios incluyendo en ella, no sólo los bienes que actualmente estén en su poder, sino los que legalmente les hayan sustituído o la estimación en efectivo de aquéllos cuya sustitución sea legalmente imposible y que, una vez conseguida la conformidad de los interesados en dicha partición, entregue a cada uno la parte de herencia que le haya sido adjudicada con la documentación correspondiente y que los demandados paguen las costas de este pleito.''

Los demandados al contestar la demanda niegan general y específicamente los hechos esenciales de la misma en cuanto directa o indirectamente se opongan a los que ellos alegan y consignan con la debida separación, estableciendo ambos contra la demanda, en primer término, la excepción de falta de acción, y en el supuesto de que existan las acciones ejercitadas, la excepción de prescripción fundada en los artículos 1266 y 1268 del Código Civil de Puerto Rico, en relación con los textos análogos del anterior Código Civil español y de las Leyes Civiles españolas vigentes anteriormente; bien entendido que el tiempo de prescripción respecto de Don Andrés y Doña Eduarda Crosas y Graham debe contarse desde que cumplieron la mayor edad y respecto de Doña Elena Graham desde la fecha de los actos y contratos cuya rescisión o nulidad se pide.

Celebrado el juicio la corte dictó sentencia en 24 de mayo de 1910 ''declarando que las operaciones de inventario, avalúo y partición de los bienes de Eduardo Crosas O'Ferral practicadas en 1887 son válidas por no adolecer de vicio alguno de nulidad; que los bienes legalmente han sido entregados a los herederos y que también son válidos los otros contratos a que se refiere la demanda, precedentes a tal partición y con ella relacionados, sin que los demandantes tengan derecho a re-

clamar nada de Don Andrés Crosas y de Don Rafael Margari. Esta sentencia es sin especial condena de costas.''

Contra dicha sentencia interpuso la representación de los demandantes recurso de apelación para ante esta Corte Suprema, sometido hoy a nuestra consideración y decisión.

Sostiene la parte apelante en su alegato escrito, que la sentencia debe ser revocada porque en ella se cometen los siguientes errores en que se funda el recurso:

Primero. Es contraria a la prueba plena o evidencia *prima facie* o concluyente, compuesta de documentos públicos, documentos privados reconocidos o aceptados por aquel a quien perjudican y confesión de una parte litigante.

Segundo. Declara válidas escrituras públicas en que se consignan contratos no realizados y consiguientemente no ordena la cancelación de las inscripciones que dichas escrituras, y las que de ellas emanaron, han causado en el registro de la propiedad.

Tercero. Declara válido el nombramiento de tutor testamentario hecho por un apoderado comisario que no tiene poder para ello.

Cuarto. Declara válido el discernimiento de la tutela *ad bona* con relevación de fianza y frutos por pensión sin previa información de los bienes del menor y de sus circunstancias, intervención del Ministerio Fiscal, determinación judicial de que la tutela se entiende en esas condiciones, y prestación de obligación por el tutor de cumplir bien y fielmente el cargo.

Quinto. Declara válido el nombramiento y discernimiento del cargo de un tutor *ad litem* para suplir la incompatibilidad del tutor *ad bona* a que se refieren los errores anteriores.

Sexto. Declara válida una partición de herencia que no fué aprobada legítimamente por los interesados en ella y que se fundaba en supuestos falsos, y consiguientemente no ordena que se lleve a cabo nueva partición, previa rendición de cuentas por el albacea contador y administrador, y que después de aprobadas cuenta y partición por los interesados

en la herencia, entregue a éstos su cuota hereditaria y la documentación correspondiente.

Séptimo. Omite declarar disuelta una comunidad de bienes cuando la solicita uno de los comuneros, y consiguientemente no hace tal declaración ni ordena que se lleve a cabo la disolución.

Con relación a los errores que se dejan apuntados, resultan de documentos aportados al juicio los hechos que en párrafos separados y numerados pasamos a consignar para considerarlos en combinación con otros hechos, y resolver con arreglo a derecho las cuestiones suscitadas.

1°. Por escritura pública de 1°. de diciembre de 1873 Don Rafael Margari y Don Andrés Crosas O'Ferral constituyeron en esta ciudad de San Juan, bajo la razón social de ''Margari y Cía.,'' por término de dos años, una sociedad mercantil regular colectiva para dedicarse al ramo de tonelería, como industria, y a los demás de su competencia comercial, con un capital de diez mil pesos cada uno de los socios, pudiendo ambos hacer uso de la firma de la razón social y tomar cada uno para sus gastos particulares la suma de 150 pesos mensuales a deducir de las ganancias que pudieran corresponderles, las que serían por mitad, con estipulación además, de que muerto uno de los socios, el sobreviviente continuaría los negocios hasta la conclusión del término fijado y liquidaría la sociedad sin intervención de persona alguna, entregando a los herederos la parte que pudiera corresponderles en la liquidación. En la misma fecha de la constitución de dicha sociedad ingresó también en ella como socio gestor Don Eduardo E. Crosas con un capital igual al de los otros dos socios, o sean diez mil pesos, según se hizo constar en documento privado.

2°. Por otra escritura pública de 1°. de diciembre de 1876 Don Rafael Margari, Don Andrés Crosas y Don Eduardo E. Crosas prorrogaron la sociedad ''Margari y Cía.'' a dos años más, que vencerían en 30 de noviembre de 1877, ratificando todas las cláusulas de la primitiva escritura de constitución de 1°. de diciembre de 1873, con la sola modificación de elevar

a 200 pesos mensuales los 150 que cada socio podía retirar mensualmente para sus gastos particulares. En esa escritura de prórroga se hizo constar expresamente, que si Don Eduardo E. Crosas al ingresar en la Sociedad "Margari y Cía.," no dió su nombre en el contrato social, fué por causas ajenas de expresar, pero había quedado sujeto a las eventualidades de la sociedad y ratificaba todas las operaciones que aparecieran en los libros comerciales de la misma, en la que ingresó oportunamente la suma de $10,000.

3º. Don Eduardo E. Crosas O'Ferral falleció el día 8 de noviembre de 1877 y cuatro días antes de su muerte había otorgado poder para testar en su nombre a su legítimo hermano Don Andrés B. Crosas O'Ferral y al otorgarlo emplea las siguientes palabras:

"Ha deliberado conferir, como por el presente confiere, a su legítimo hermano Don Andrés Crosas de este domicilio el más absoluto, amplio, cumplido, bastante y eficaz poder cuanto en derecho se requiera y necesario sea a valerle, para que arreglado a las instrucciones que ya le tiene comunicadas y le dará, si necesario fuere, proceda a otorgar su testamento y última voluntad en el cual le autoriza para que haga la declaratoria de sus bienes y deudas, mandas y demás legados de que se halle instruído sin reservación de ninguna especie por la ilimitada confianza que le merece, prorrogándole para ello el más tiempo que necesite si no lo hiciere dentro de los cuatro meses que prescriben las leyes, reservándose en sí lo siguiente."

Siguen dos cláusulas sobre protestación de fe y legados piadosos y continúa:

"Item Tercera. Le ordena declare que es casado legítimamente con Doña Elena Graham, de cuyo matrimonio sólo tienen un niño como de seis meses de edad, llamado Andrés Bernardino Crosas. Y por cuanto, éste se encuentra en la menor edad, atendida la confianza que le marece su citado hermano Don Andrés Crosas, de que de consuno con su madre cuidará de su persona y bienes con todo esmero y eficacia, por la presente le nombra por su tutor y curador *ad bona,* con relevación de toda fianza, consignándole frutos por pensiones, suplicando a los Señores Jueces que de esta cláusula deban conocer, se sirvan confirmarla, impartiéndole su judicial aprobación.

"Item Cuarta. Le manda haga la declaratoria de sus bienes, y deudas en favor y contra por la que se esté y pase, sin que persona alguna, aunque legítima sea pueda impugnar ésta, pues desde ahora para entonces, la aprueba, ratifica y confirma en todas sus partes.

"Item Quinta. Como un deber y verdadera expresión del cariño que profeso a mi Sra. Madre Doña María L. O'Ferral, vengo en legarle el quinto líquido de mis bienes; igualmente utilizando el derecho que las leyes me conceden y por los mismos fundamentos, la lego por vía de herencia o como mejor proceda la sexta parte de mis bienes para que los disfrute a su voluntad.

"Item Sexta. Para cumplir y pagar lo contenido en este poder y en el testamento que en su virtud se otorgue, le ordena se nombre como lo nombra por su único Albacea, confiriéndole amplias facultades para que dentro o fuera del término legal que al intento le prorroga a todo el que necesite, proceda extrajudicialmente y no de otra suerte que prohibe, al arreglo de su testamentaría hasta dejarla finiquitada y aprobada, entrando en la libre administración de los bienes, como tutor de su hijo único heredero, vendiendo los bienes que fueren necesarios y otorgando los documentos del caso.

"Item Séptima. Y cumpliendo y pagando todo, en el remanente líquido que quedare de todos sus bienes, derechos y acciones y futuras sucesiones habidas y por haber, instituya y así lo ordena, por su único y universal heredero a su citado hijo Don Andrés Bernardino Crosas y los demás que resulten de su enlace, para que luego de su finamiento se apoderen de ellos y los hayan, gocen y hereden con la bendición de Dios y la suya."

4°. Disuelta la sociedad Margari y Cía., por haber vencido en 30 de noviembre de 1877 la prórroga del término de dicha sociedad, se consignó el estado de la misma en un inventario-balance, en cuyo activo que es de $92,764 figuran como efectivo en caja $14,419.18 y los solares números 6; 11 y 12 y 16 situados en el barrio de la Marina de esta ciudad, con valor respectivamente de $3,232.98, $2,913.40, $2,790.20 y $250, habiendo un pasivo de $62,778.38 en el que aparecen como acreedores por cuenta de capital, Rafael Margari, Andrés Crosas y E. E. Crosas con la suma de $16,799.82, por lo que hay un beneficio líquido de $29,985.62 del que ha de deducirse por lo que aun se adeuda a la Real Hacienda del precio de los solares, la suma de $2,737.22, menos $103 por importe de varios recibos

de alquiler de habitaciones en los mismos, quedando a distribuir el total de $27,351.40 que hacen un reparto de beneficios a cada uno de los tres socios de $9,117.13.

5°. Por escritura pública de 15 de diciembre de 1877 Don Rafael Margari vende a Don Andrés Crosas la participación que tenía en la sociedad Margari y Cía. ya en liquidación, en la que según el inventario-balance practicado el día 1°. del mismo mes le correspondían al vendedor $25,916.97, a saber: $16,799.84 por su cuenta de capital y $9,117.13 por su tercera parte de beneficio, verificándose la venta por $21,000 fuertes extranjeros, $20,742 en moneda efectiva y los $258 restantes en el valor del solar número 16 que se adjudica a Margari. En ese documento se hace constar por los otorgantes que Margari desde el día 30 de noviembre anterior tenía vendidas a Don Andrés Crosas todas las existencias, bienes raíces y demás efectos que le correspondían en la sociedad Margari y Cía., así como la parte que le pudiera tocar en los solares números 6, 11 y 12, quedándose con el número 16 por el precio de $258 en que fué adquirido.

6°. Por otra escritura pública otorgada en 18 de diciembre de 1877, Don Andrés Crosas y Don Jorge Isidoro Finlay constituyeron una sociedad mercantil bajo la razón social de Crosas y Finlay de la que ambos serían socios gestores administradores y por término de dos años, para dedicarse al ramo de comercio de tonelería como industria y a los demás de su competencia comercial, por mayor y menor, aportando cada uno de los socios a la compañía la suma de $15,000.

7°. En la *Gaceta Oficial de Gobierno,* número correspondiente a 20 de diciembre de 1877, se publicó una circular fechada el día anterior, en la que Margari y Cía. en liquidación participa que desde dicha fecha cesaba en sus negocios por compra que de todas sus existencias había hecho Don Andrés Crosas, continuando la liquidación de la misma según circular a la vuelta. Y en esa circular a la vuelta participan a su vez Crosas y Finlay que en la propia fecha habían establecido una sociedad mercantil que girará bajo la razón de Crosas y

Finlay, dedicándose a los mismos negocios que su antecesora de cuya liquidación se han hecho cargo, siendo únicos socios gestores Don Andrés Crosas y Don Jorge I. Finlay.

8°. Por escritura pública de 25 de mayo de 1878 la Sociedad Agrícola Skerret Hermanos y Cía. representada por su socio gestor administrador Don Fernando M. Cesteros y Mangual, declaró que desde julio de 1877 hasta la fecha de la escritura, había recibido del comerciante Don Eduardo Crosas y luego de sus herederos y sucesores, diversas sumas que liquidadas ascendían a $30,186.82 moneda fuerte extranjera, para el cultivo e incremento de las haciendas "Monserrate," "Julita" y "Carmela" (*a*) "Ortega" y que a requerimiento del albacea representante de la sucesión de Don Eduardo Crosas, reconocía deber por refacción a dicha sucesión la predicha suma, que satisfaría con los sobrantes de la cosecha del año 1878 lo mismo que con los de la del año de 1879 a medida que se fueran vendiendo los frutos de las tres haciendas, debiendo abonar por la demora en el pago de esa suma, el interés convenido del 1 por ciento mensual, que comenzó a correr desde el día 10 de marzo de 1878 y afectando al pago en tácita hipoteca, las repetidas haciendas con todos sus frutos, máquinas, terrenos, plantaciones, bueyada, y demás que constituían su dotación, a cuya escritura prestó su conformidad Don Andrés Crosas en su carácter de albacea por ser cierta en todas sus partes.

9°. Por tres escrituras públicas otorgada una de ellas en 28 de abril de 1880, y las otras dos en 29 del mismo abril, Don Rafael Margari y Báez vendió a la sociedad mercantil Crosas y Finlay, representada por su socio gestor Don Andrés Crosas, tres solares números 6, 11 y 12, radicados en el barrio de la Marina de esta ciudad que Margari había adquirido por remate que tuvo lugar ante la Junta de Almoneda de Hacienda Pública de la Isla en 29 de noviembre de 1875, verificándose la venta por el mismo precio en que Margari adquirió dichos solares y por valor recibido de las cantidades que tenía satisfechas Margari a la Hacienda Pública, obligándose Cro-

sas y Finlay a pagar el resto de los plazos de venta aun no satisfechos a la Real Hacienda.

10°. Con fecha 14 de enero de 1881 Don Andrés Crosas haciendo uso del poder que le confirió su hermano Don Eduardo en 4 de noviembre de 1877, otorgó el testamento cuya cláusula tercera dice así:

"También le ordenó declarase según la cláusula tercera (del poder), estar casado su repetido hermano legítimamente con Doña Elena Graham de cuyo matrimonio sólo habían tenido un hijo nombrado Andrés Bernardino Crosas y Graham, pero como quiera que la esposa al fallecimiento de su poderdante Don Eduardo, se hallaba en estado grávido, aun cuando no se hizo mérito de esta circunstancia en el poder, siendo un hecho positivo y legítimo, el otorgante ejerciendo las facultades con que se halla revestido, declara por la presente cláusula que la citada Doña Elena Graham dió a luz posteriormente una niña a la que se puso por nombre Eduarda, así es que debe ser considerada, tenida y reputada como legítima hija de su citado hermano Don Eduardo, para todos los efectos legales, como procedente de su citado consorcio con la Doña Elena y por haber nacido viable; y toda vez que el finado su poderdante nombró al mismo otorgante Don Andrés Crosas y O'Ferral por tutor y curador *ad bona* de su otro legítimo hijo Don Andrés Bernardino Crosas y Graham, cumpliendo la voluntad expresa de éste, y por virtud de las instrucciones terminantes que le comunicó para el presente caso, hace extensivo ese nombramiento para que lo sea también de su otra hija Doña Eduarda Crosas y Graham con la propia relevación de fianza y consignación de frutos por pensión."

En la cláusula 4ª. declara que los bienes de su finado hermano Don Eduardo, son los siguientes:

"Un solar con dos bohíos de paja y madera situado en el barrio de Puerta de Tierra de esta ciudad, primera línea, encontrándose dichos bohíos en mal estado; una obligación constante de escritura pública otorgada a favor del Don Eduardo por la Sociedad Skerret Hermanos y Cía. por refacción suministrada a las haciendas Monserrate, Julita y Carmela, las dos primeras en el Dorado y por la suma de (30,186 pesos 82 centavos) treinta mil ciento ochenta y seis pesos ochenta y dos centavos, moneda corriente, y la parte que le corresponde en la liquidación de la sociedad mercantil Margari & Co.,

constante de escritura pública cuya liquidación según balance general pasado en 30 de noviembre de 1877, en la parte correspondiente a Don Eduardo, asciende a veinticinco mil novecientos dieciseis pesos, estando esa liquidación a cargo del exponente Don Andrés Crosas; y además un pagaré firmado por Don Manuel Barasoaín y su esposa Doña Juana Colón en 5 de septiembre de 1876 por dos mil quinientos pesos.''

En la cláusula 5ª. del testamento se hace un legado del 5°. y 6°. de los bienes a Doña María L. O'Ferral madre legítima de Don Eduardo; por la cláusula 6ª. se nombra Don Andrés Crosas albacea de Don Eduardo; en la cláusula 7ª. se establece otro legado de otro 5°. de los bienes a favor de Doña Elena Graham con calidad de usufructuaria, para que dichos bienes pasasen a los herederos de Don Eduardo después del fallecimiento de Doña Elena; y por la cláusula 8ª. se hace la institución de herederos a favor de Don Andrés Bernardino y Doña Eduarda Crosas y Graham, según así se dispuso todo por Don Eduardo Crosas.

11°. Con fecha 20 de mayo de 1881 Don Andrés Crosas en concepto de tutor y curador testamentario de los menores Andrés Bernardino y Eduarda Crosas y Graham, acudió por medio de escrito al Juzgado de Primera Instancia del Distrito de Catedral de San Juan, solicitando se le admitiera información testifical para acreditar la necesidad y utilidad de la cesión del crédito hipotecario de $30,186.82 contra Skerret Hermanos y Cía. constituído por escritura pública de 25 de mayo de 1878 y por otrosí pidió que previamente se le discerniera el cargo de tutor y curador de los referidos menores, a lo que accedió el juzgado en 28 de mayo citado, discerniendo en ese mismo día a Crosas el cargo de tutor de los citados menores, con relevación de fianza por ahora y señalamiento de frutos por pensión. Practicada la información testifical solicitada por Crosas, el propio juzgado por auto de 10 de junio siguiente otorgó a Crosas como tutor de los menores Andrés y Eduarda Crosas y Graham, autorización para proceder a la venta del indicado crédito con objeto de adquirir

una finca de mejores rendimientos, entendiéndose esa autorï-
zación bajo la condición precisa de haberse de ejecutar la
venta en pública subasta. Celebrada ésta y aprobado el re-
mate en 12 de agosto de 1881, a favor de Don Nicolás Ordaz,
en 5 de septiembre siguiente, según diligencia que suscriben
Don Andrés Crosas, Don Nicolás Ordaz y el Escribano ac-
tuario Don José María San Juan, sin que lo haga el juez por
más que así se afirma, Ordaz hizo entrega a Crosas y éste se
dió por recibido de la cantidad de $30,686.82 como precio del
remate, habiéndose presentado esa cantidad en moneda de
plata mejicana.

12º. Por escritura pública de 14 de julio de 1881 Don Fer-
nando M. Cesteros, como gestor de Skerret Hermanos y Cía.,
vendió a Don Andrés Crosas un predio rústico radicado en la
jurisdicción de Río Grande, barrio de Herrera, denominado
"Los Cocos," compuesto de 631 cuerdas y 83 centavos de otra,
con una casa de madera, de altos y bajos, por precio de
$15,000 moneda comercial, que la vendedora confesó recibidos
antes de aquel acto.

13º. Por otra escritura pública de 22 de diciembre de 1883
el propio Don Andrés Crosas vendió a Don Carlos y Don Emi-
lio Just y Jensen el mismo predio denominado "Cocos" que en
14 de julio de 1881 había comprado a Skerret Hermanos y Cía.,
habiendo verificado Crosas la venta por precio de $25,000
extranjeros, a saber, $6,000 que confesó haber recibido de los
compradores y los $19,000 restantes a pagar en seis plazos
distintos que habían de vencer en 22 de diciembre de los años
de 1886 a 1891 ambos inclusive, el primero, cuarto, quinto y
sexto plazos de $3,000 y el segundo y tercer plazos de $3,500
cada uno, con garantía hipotecaria por todo el precio
aplazado.

14º. En escritura otorgada en 18 de junio de 1883 sobre
protocolización de la testamentaría de Don Nicolás Ordaz,
aparece que éste declaró en la cláusula 5ª. de su testamento
como parte de sus bienes, dos créditos contra la sociedad Agrí-
cola Skerret Hermanos y Cía., para cuyo cobro siguió pleito

ejecutivo que a su muerte se encontraba en procedimiento de apremio y que continuó Doña Isabel Sampayo como representante de la Sucesión de Ordaz, habiendo obtenido con arreglo a ley la adjudicación de los bienes embargados entre los que figuran las haciendas "Monserrate," "Carmelita" y "Julita," que vinieron por tanto a reemplazar los mencionados créditos. De la misma escritura resulta que durante la sociedad conyugal de Doña Isabel Sampayo y Don Nicolás Ordaz se contrajeron varias deudas, muchas de ellas sin pagar a la muerte de Ordaz, mereciendo especial mención una deuda en favor de Andrés Crosas, importante de $12,525, valor de una obligación adquirida por Nicolás Ordaz, el crédito de los Sres. Crosas y Finlay y el de Doña Carolina Skerret importante éste $25,000 y todas las deudas $136,868.56 que habían de ser baja del cuerpo general de bienes y de cuyo pago se hizo cargo Doña Isabel Sampayo, a cuyo fin se le adjudicaron las haciendas "Carmelita" y "Julita" con sus edificios y parte del valor total de los terrenos, fábricas, edificios, enseres y útiles de la hacienda "Monserrate."

15°. Por escritura pública de 31 de agosto de 1883 Doña Isabel Sampayo, Viuda de Don Nicolás Ordaz cede a Don Andrés Crosas un trozo de 100 cuerdas de la hacienda "Julita," en pago de la deuda de la testamentaría de Don Nicolás Ordaz montante $12,523 y procedente, según dice dicha escritura, de la cesión que al finado hizo Don Andrés Crosas de un crédito contra Skerret Hermanos y Cía., dándose Crosas por pagado a su entera satisfacción.

16°. Con fecha 15 de agosto de 1886 Don Andrés Crosas y Don Miguel Sainz promovieron ante el Juzgado de Primera Instancia del Distrito de San Francisco de San Juan, expediente para justificar la posesión de las casas números 40 de la calle de Sol y 8 de la calle de San José de esta capital de las que pertenecían dos terceras partes a Don Andrés Crosas, por herencia de su padre Don Bernardino Crosas y una tercera parte a Don Miguel Sainz por herencia de su hijo Don Bernardino, habiendo expresado ambos que eran los únicos

componentes de la Sucesión de Don Bernardino Crosas; y acreditada dicha posesión fué aprobada la información por auto de 26 de septiembre de 1886.

17° En 29 de abril de 1887 Don Andrés Crosas presentó escrito al Juzgado de Primera Instancia del Distrito de Catedral con súplica de que se nombrara un curador *ad litem* que l'evara la representación de los menores Don Andrés Bernardino y Doña Eduarda Crosas en el arreglo extrajudicial de la testamentaría de su difunto padre Don Eduardo, ya que él como albacea y contador partidor de los bienes, no podía llevar su representación y tampoco su señora madre Doña Elena Graham residente en la ciudad de New York, por el interés que tenía en la testamentaría como legataria que era de parte alícuota del caudal; y por otrosí hizo presente Don Andrés Crosas al Juzgado a los efectos del artículo 1854 de la Ley de Enjuiciamiento Civil entonces vigente, que los citados menores carecían de parientes inmediatos que pudieran hábilmente representarlos. El juzgado nombró curador *ad litem* de los expresados menores a Don Benigno Trueba y aceptado por éste el cargo obligándose a desempeñarlo bien y fielmente le fué discernido en 2 de mayo siguiente.

18°. Con fecha 3 de junio de 1887 Don Andrés Crosas como albacea testamentario de su hermano Don Eduardo y Don Miguel Sainz y Don Benigno Trueba, el primero en su carácter de apoderado de Doña Elena E. Graham, y el segundo como curador *ad litem* de los menores Don Andrés Bernardino y Doña Eduarda Crosas y Graham, bajo la dirección del Licenciado Don José S. Quiñones presentaron al Juzgado de Primera Instancia de Catedral, las operaciones de inventario, avalúo y divisoria de los bienes del finado Don Eduardo E. Crosas para que teniéndolos por conformes con las citadas operaciones, fueran aprobadas y se mandaran protocolizar en cualquiera de las notarías de San Juan, suplicando además al juzgado por otrosí se tuviera por hecha la manifestación de que Doña María L. O'Ferral firmaba en unión de los peticionarios como prueba de asentimiento y conformidad con la

renuncia que se consignaba en la cuenta divisoria de los legados del quinto y sexto que le dejara su difunto hijo Don Eduardo, en favor de la viuda de éste y de sus dos hijos.

Los bienes y créditos de Don Eduardo Crosas tales como aparecen en el inventario y avalúo que de ellos formó Crosas en 25 de mayo de 1887 con los peritos tasadores Don Andrés García Quiara y Don José María Fernández, son los siguientes:

### DINERO EFECTIVO.

1. Veinte y ocho mil doscientos cincuenta y seis pesos noventa y cinco centavos que correspondieron al finado Don Eduardo por tercera parte en la liquidación de Margari & Co., según cuenta producida_____ $28, 256. 95
2. Catorce mil ciento veintiocho pesos cuarenta y ocho centavos, mitad de la suma anterior que cedió y entregó el albacea en cambio de 5 pagarés pendientes de cobro procedentes de la deuda de Skerret Hermanos & Co., según convenio con los interesados_____ 14, 128. 48
3. Dos mil pesos que entregó Doña María L. O'Ferral de Crosas, manifestando que dicha suma pertenecía al finado _____ 2, 000. 00
                                                                 _____
                                                                 $44, 385. 43

### DOCUMENTOS.

4. Un pagaré otorgado por Don Manuel Barasoaín y su esposa Doña Juana Colón a favor del finado, por dos mil quinientos pesos fechado en 5 de septiembre de 1876, vencido e incobrable desde su fecha_____ 2, 500. 00

### BIENES RAÍCES.

5. Un solar radicado en el barrio de Puerta de Tierra de esta ciudad, según se describe, que no contiene fábrica alguna y fué valorado en doscientos cincuenta pesos_____ 250. 00
6. Cien cuerdas de terreno que forman parte de la Hacienda "Julita" de la jurisdicción del Dorado y que también se describen, valoradas por los peritos en seis mil quinientos pesos_____ 6, 500. 00
                                                                 _____
    Total de inventario_____ $53, 635. 43

Para las operaciones de liquidación, cuenta y partición de los bienes relictos por Don Eduardo Crosas, estableció el albacea Don Andrés entre otros supuestos, los siguientes atinentes al caso:

(*a*) Que Don Eduardo a su fallecimiento dejó como bienes: Un solar en Puerta de Tierra con dos bohíos en mal estado; una obligación de Skerret Hermanos y Cía. por $30,186.82; su parte en la liquidación de la casa comercial de Margari y Cía., montante en 30 de noviembre de 1877 a $25,916; y un pagaré de Don Manuel Barasoaín y su esposa Doña Juana Colón por 2,500 pesos, todo en moneda corriente en el comercio.

(*b*) Que con referencia a la administración de los bienes expresados, resulta que el solar de Puerta de Tierra está improductivo y sin los dos bohíos, por no permitir el Gobierno que se reparasen los bohíos ni se utilizara para nada el solar, dificultándose así su venta; que debido a la quiebra de Skerret Hermanos y Cía. fué imposible en su día hacer efectiva la deuda de estos señores, por lo que después de muchos trabajos y arreglos y no haber otra cosa mejor, fué de necesidad recibir en pago de ella 100 cuerdas de terreno de la hacienda "Julita" y cinco pagarés, dos de ellos por $3,500, y los restantes por $3,000 cada uno, vencederos en 22 de diciembre de 1887, 1888, 1889, 1890 y 1891, total $16,000; que la liquidación de la tercera parte correspondiente a la casa comercial de Margari y Cía. después de debitadas las cuentas incobrables y abonados los respectivos intereses, según pormenor en la cuenta y libros de la expresada sociedad, asciende a la suma de $28,256.95 y que el pagaré de Don Manuel Barasoaín y esposa por $2,500 subsiste incobrable por insolvencia de los deudores habiendo pagado éstos solamente $226.25 a cuenta de intereses, los que constan abonados en la cuenta particular producida.

(*c*) Que después del fallecimiento de Don Eduardo Crosas fueron satisfechos todos los gastos ocurridos en su enfermedad, entierro, deudas y manutención en New York de la viuda

Doña Elena Graham y sus dos hijos según consta en las cuentas respectivas.

(*d*) Que visto por el albacea que las rentas del efectivo de la testamentaría no eran suficientes a cubrir los gastos precisos de manutención de la viuda e hijos del finado y la educación de éstos en el Estado de New York, llamó la atención sobre el particular a los interesados o sus representantes, proponiéndoles que para conseguir el objeto, cedería él una mitad más de la tercera parte de la liquidación de Margari y Cía., o sean $14,128.48 en efectivo, en cambio de los cinco pagarés pendientes de cobro procedentes de la deuda de Skerret Hermanos y Cía., montante a $16,000, a cuya proposición accedieron con gusto, tanto por considerla beneficiosa para los partícipes y bienestar y educación de los niños, cuanto por que si para el efecto se descontasen dichos pagarés hasta el vencimiento, el resultado sería mucho menor que la cantidad propuesta.

(*e*) Que sabiendo Doña María L. O'Ferral el legado del 5°. y 6°. que se le había hecho en el testamento y que se trataba de formalizar la testamentaría de su hijo Don Eduardo, había manifestado al albacea que en prueba de afecto y cariño renunciaba a favor de sus dos nietos y de la madre de éstos, los referidos legados que se distribuirían en dos partes, a saber: la mitad para Doña Elena y la otra mitad para los dos nietos, entendiéndose la mitad de la primera en concepto de usufructo, pues al fallecimiento de ésta debía entregarse lo que resultara a sus ya indicados nietos.

Con arreglo a las bases y supuestos de que se deja hecho mérito y a lo que resultaba de las cuentas y documentos correspondientes, procedió el albacea a formar el cuerpo de bienes, deducciones y partición entre los herederos en la forma siguiente:

CUERPO DE BIENES.

| | |
|---|---|
| Un solar en el barrio de Puerta de Tierra tasado en____ | $250. 00 |
| 100 cuerdas de terreno de la Hacienda ''Julita'' tasadas en _____ | 6, 500. 00 |
| A la vuelta_____ | $6, 750. 00 |

De la vuelta_____ $6, 750. 00

Efectivo producido de la tercera parte en la liquidación
de Margari & Co. según cuenta producida_____ 28, 256. 95

Efectivo recibido del albacea mitad de $28,256.95, según
lo consignado en el supuesto letra D_____ 14, 128. 48

Efectivo recibido de Doña María L. O'Ferral de Crosas,
suma que declara pertenecía a la testamentaría_____ 2, 000. 00

Pagaré de Don Manuel Barasoaín y su esposa_____ 2, 500. 00

Importe del caudal hereditario_____ $53, 635. 43

BAJAS.

Por pagos hechos por cuenta de la testamen-
taría según cuenta particular producida____ $4, 307. 83

Gastos de alimentos y educación de los meno-
res herederos_____ 15, 081. 42

                                                  19, 389. 25

Total líquido _____ $34, 246. 18

Dichas bajas fueron pagadas en efectivo, la primera
de ellas a Don Andrés Crosas y la segunda a los Sres.
Crosas y Finlay.

DEDUCCIONES.

Quinta parte del legado de la viuda Doña
Elena Graham_____ $6, 849. 24.

Quinta parte del legado a favor de Doña Ma-
ría L. O'Ferral_____ 5, 479. 38

Sexta parte del legado de la misma_____ 3, 652. 92

                                                  15, 981. 54

                                                  $18, 264. 64

Del caudal líquido expresado, o sea de los diez y ocho mil
doscientos sesenta y cuatro pesos sesenta y cuatro centavos,
corresponde a cada uno de los herederos, la mitad o sea la
suma de nueve mil ciento treinta y dos pesos treinta y dos
centavos.

En consideración a la renuncia de sus legados hecha por
Doña María L. O'Ferral se formaron las siguientes hijuelas:

HIJUELA DE LA VIUDA DOÑA ELENA GRAHAM.

Ha de haber esta interesada:

| | |
|---|---|
| Por el legado del quinto_____ | $6, 849. 24 |
| Por la mitad que le ha correspondido en los legados renunciados a favor de ella y de sus hijos por Doña María L. O'Ferral_____ | 4, 566. 15 |
| Total_____ | $11, 415. 39 |

HIJUELA DEL HEREDERO DON ANDRÉS BERNARDINO.

Ha de haber este heredero:

| | |
|---|---|
| Por la mitad del haber líquido hereditario_____ | $9, 132. 32 |
| Por la cuarta parte de los $9,132.30 que importan los legados renunciados_____ | 2, 283. 08 |
| Total_____ | $11, 415. 39 |

HIJUELA DE LA HEREDERA DOÑA EDUARDA CROSAS.

Ha de haber esta heredera:

| | |
|---|---|
| Por la mitad del haber líquido hereditario_____ | $9, 132. 32 |
| Por la cuarta parte del montante de los legados renunciados_____ | 2, 283. 07 |
| Total_____ | $11, 415. 39 |

A la viuda Doña Elena Graham y a cada uno de sus dos hijos se les adjudica en igual forma una cantidad igual indivisa en el solar de Puerta de Tierra en las 100 cuerdas de la "Julita," en el dinero efectivo y en el pagaré de Barasoaín y esposa.

19°. Las operaciones de inventario, avalúo y divisoria de los bienes de Don Eduardo E. Crosas fueron aprobadas por auto que dictó el Juzgado de Primera Instancia del Distrito de Catedral en 7 de junio de 1887, cuya parte resolutiva dice así:

"Su señoría por ante mí dijo: que debía aprobar y aprobaba las operaciones divisorias y las de inventario y avalúo hechas por el albacea contador Don Andrés Crosas, en unión de los demás interesados, Don Miguel Sainz y Don Benigno Trueba, el primero en su carácter de apoderado de Doña Elena E. Graham y el segundo como cura-

dor *ad-litem* de los menores Don Andrés Bernardino y Doña Eduarda Crosas, viuda e hijos respectivamente del difunto Eduardo E. Crosas y O'Ferral, de los bienes que forman la herencia de este último, mandando en su consecuencia protocolizarlas con testimonio de este auto, en los registros del Notario Don Mauricio Guerra, previo reintegro del papel sellado correspondiente. Entréguese a cada uno de los interesados lo que en ellas les ha sido adjudicado, con los títulos de propiedad puesta en éstos por el Escribano nota expresiva de la adjudicación que deberán presentar dentro del término legal en la oficina liquidadora del impuesto sobre derechos reales, y en el registro de la propiedad para su inscripción, sin cuyo requisito no se admitirán en perjuicio de tercero en los Juzgados y Tribunales, y oficinas del Gobierno. Y por éste, su auto, así lo pronunció, mandó y firma el Sr. Don Manuel Suárez Valdés, Juez de Primera Instancia del distrito de Catedral ante mí el Escribano que doy fe. Al otrosí del escrito a que se ha proveído, por hecha la manifestación que contiene. Lo mandó y firma también el repetido Sr. Juez, por ante mí que doy fe. Manuel Suárez Valdés. José Ma. San Juan.''

20º. En.acta notarial de 25 de julio de 1887 hizo constar Don Andrés Crosas:

''Que por consecuencia de un crédito hipotecario que tenía su hermano Don Eduardo Crosas y O'Ferral sobre la Hacienda ''Julita'' de la jurisdicción del Dorado y que con objeto de facilitar cualquier negociación se encontraba a favor del exponente, celebró una transacción en virtud de la dificultad de cobrar dicho crédito por la que compró a Doña Isabel Sampayo, adjudicataria de los bienes señalados para pago de bajas de la testamentaría de Don Nicolás Ordaz un trozo de terreno de dicha hacienda (100 cuerdas que describe), y que esa venta se hizo para llevar a efecto una transacción y por consiguiente debió hacerse la venta a favor de su citado hermano; y toda vez que al formalizarse la testamentaría de éste se hace preciso que esa finca pase a formar parte del caudal relicto por aquél, puesto que le corresponde en propiedad desde el año 1883 en que la compró el compareciente por ser el crédito que motivó la adquisición del exclusivo dominio de Don Eduardo, está en el deber de declarar esta circunstancia y en su consecuencia otorga: Que la finca deslindada se entenderá como de la propiedad de su hermano el referido Don Eduardo Crosas y O'Ferral, desde la fecha de su adquisición, queriendo que pase a formar parte del caudal relicto por aquél a su fallecimiento y por tanto que se efectúe la previa inscripción de ella

a favor de su hermano, para que no obstaculice la que ha de hacerse a nombre de sus herederos al llevar al registro de la propiedad lá protocolización de su testamentaría, renuncia a su favor cualquier derecho que por la mencionada adquisición de la finca reseñada hubiera recaído en el compareciente, con lo que cumple un deber, pues repite que en ella no ha tenido ni tiene ninguna participación.''

21º. Finalmente por escritura pública de 10 de diciembre de 1890, Don Andrés Crosas y Don Jorge I. Finlay disolvieron la Sociedad Crosas y Finlay, percibiendo Finlay $30,000 por capital y utilidades que recibió de Crosas y adquiriendo éste todos los bienes muebles e inmuebles de Crosas y Finlay, entre ellos los solares números 6, 11 y 12 de la Marina, excepción hecha de la hacienda ''Santa Bárbara.''

De los hechos resultantes de las pruebas practicadas en el juicio, hemos tomado aquellos que nos ha parecido conveniente dejar apuntados para mayor claridad en la discusión de los fundamentos del recurso de apelación, sin perjuicio de que en el curso de la discusión nos hagamos también cargo de la demás evidencia suministrada por ambas partes hasta donde lo creamos necesario.

Con los hechos expuestos pasemos ahora a considerar los motivos legales del recurso de apelación sometido a nuestra decisión.

### PRIMER MOTIVO DEL RECURSO.

Al razonar la parte apelante en su alegato escrito el primer motivo del recurso, consistente en que *la sentencia es contraria a la prueba plena o evidencia prima facie o concluyente, compuesta de documentos públicos, documentos privados reconocidos o aceptados por aquel a quien perjudican, y confesión de una parte litigante,* se limita a transcribir los preceptos legales que contienen los artículos 195 del Código de Enjuiciamiento Civil, los 1186, 1193 y 1200 del Código Civil, y los 70, 71 y 101 de la Ley de Evidencia; y después de expresar que para evidenciar los errores cometidos en la sentencia ha de utilizar única y exclusivamente la prueba de documentos

públicos y privados reconocidos que fueron aportados al juicio de los que hace una relación suscinta, como también dice que al mismo fin ha de utilizarse igualmente la declaración de Don Andrés Crosas, concluye por manifestar que en la puntualización de los demás errores de la sentencia apelada, se ha de demostrar como ha sido desatendida toda esa prueba por la corte inferior.

Como se ve, en la exposición del primer motivo del recurso no se plantea un debate judicial fijo, concreto y determinado, sino que ese debate se reserva para cuando se puntualicen los demás errores de la sentencia apelada; y por tanto nos falta base para discutir aisladamente el primer motivo del recurso el cual será discutido cuando se nos presente la oportunidad de hacerlo al considerar los demás fundamentos del recurso. Seguiremos el mismo plan que se traza por la representación de la parte apelante.

### SEGUNDO MOTIVO DEL RECURSO.

Fúndase ese motivo, como ya dejamos indicado, en que la corte inferior cometió error *declarando válidas escrituras públicas en que se consignan contratos no realizados y no ordenando la cancelación de las inscripciones que dichas escrituras y las que de ellas emanaron han causado en el registro de la propiedad.*

Las escrituras públicas a que se refiere la parte apelante son la de 15 de diciembre de 1877, por la que Don Rafael Margari vende a Don Andrés Crosas la participación que tenía en la sociedad Margari y Cía., ya en liquidación, y las tres otorgadas una en 28 de abril de 1880 y las otras dos en 29 del mismo abril, por las que Don Rafael Margari vendió a la sociedad mercantil Crosas y Finlay, representada por su socio gestor Don Andrés Crosas, tres solares números 6, 11 y 12 radicados en el barrio de la Marina de esta ciudad.

El contenido de esas escrituras ha sido relacionado bajo los números 5°. y 9°. de los hechos que en párrafos separados y numerados dejamos consignados en la presente opinión.

Contra la escritura de 15 de diciembre de 1877, se alega por los demandantes en su demanda que Don Andrés Crosas simuló comprar a Rafael Margari, en su exclusivo nombre, pero con capital perteneciente por mitad al caudal hereditario de su hermano y al fingido comprador, la participación que Rafael Margari tuvo en la liquidación de la sociedad mercantil Margari y Cía., de que los tres formaron parte, cuando esa participación correspondía ya a Eduardo E. Crosas y a su hermano Andrés por compra anterior que le tenían hecha a Margari.

De dicha simulada enajenación no se ha suministrado más prueba que la que pueda arrojar la declaración jurada del demandado Don Andrés Crosas. De ella transcribimos literalmente lo siguiente:

"No tenían los hermanos Crosas el propósito de continuar la sociedad con Don Rafael Margari y sí los hermanos Crosas entre sí, y su hermano le dijo, puesto que hay un poder para testar le dió esas instrucciones verbales. Su hermano Eduardo le dijo que hiciera todo sacrificio por separarse y comprarle a Rafael Margari. Estando ya enfermo Don Eduardo y teniendo el propósito de prescindir de Don Rafael Margari, habían de prescindir de éste al liquidar la sociedad, comprándole en nombre de los dos, como así hizo el testigo la divisoria. Los hermanos Crosas convinieron con Rafael Margari en comprarle la participación que él tenía en la sociedad Margari & Co., al estilo del comercio que se simplifican mucho las cosas y no tienen tantas leyes; cuando se va a separar un socio de una casa se llaman dos o tres testigos mercantiles, y en presencia de ellos, se ofrece por nota cerrada el valor que cada uno ofrece por esa participación, y así fué que la nota que bajo pliego cerrado ofreció el testigo, fué la mayor. En vida de Don Eduardo Crosas no fué convenido con Margari comprarle la participación que tenía en Margari & Co. porque tenía que tener efecto esa junta en presencia de testigos. Después de muerto su hermano, compró el testigo la participación de Don Rafael Margari por cuenta del testigo y de los representantes y sucesores de su hermano. En la escritura no se consignó así, sí solamente que era por cuenta del testigo, porque ya ha dicho, entre comerciantes, se simplifican las cosas y no hay tanto trámite, y de ahí viene que le tienen miedo a los menores por todos los trámites que hay que tener presente."

Oscura y defectuosa nos parece esa declaración de. Don Andrés Crosas para poder deducir de ella que positivamente la compra de la participación de Don Rafael Margari en la Sociedad Margari y Cía., se hizo para Don Andrés Crosas y la Sucesión de su hermano Eduardo. No hay duda que los hermanos Don Andrés y Don Eduardo Crosas tenían el propósito de comprar para los dos la participación de Don Rafael Margari en la Sociedad Margari y Cía., al vencerse el término de esa sociedad, pero no sabemos si realmente los hermanos Crosas, estando vivo Don Eduardo, llegaron a convenir en la compraventa, pues en ese particular se contradice Don Andrés Crosas afirmando primeramente que el convenio tuvo lugar en vida de su hermano y expresando después que en vida de Don Eduardo no fué convenido con Margari comprarle su participación en Margari y Cía. Tampoco nos dice Don Andrés Crosas en qué términos concertaron él y su hermano Eduardo el contrato de compraventa con Don Rafael Margari, ni Margari ha declarado en el presente juicio. Dice Crosas que compró en nombre de los dos, como así hizo el testigo la divisoria; pero ésta no comprueba tal afirmación a no ser que Crosas haya querido decir que el saldo líquido de Margari y Cía., de hecho se repartió entre Don Andrés Crosas y la Sucesión de Don Eduardo.

Aun en el supuesto no probado de que en vida de Don Eduardo Crosas, éste y su hermano Don Andrés convinieran con Don Rafael Margari en la compraventa de la participación de éste en Margari y Cía. sin fijarse las condiciones del contrato, tales condiciones, muerto ya Don Eduardo, no hubieran podido fijarse por Don Andrés Crosas a nombre de la Sucesión de Don Eduardo en la fecha en que formalizó el contrato, pues entonces no tenía representación legal de dicha Sucesión. Ni era apoderado de la viuda Doña Elena Graham, ni le había sido discernido el cargo de tutor de los menores Don Andrés Bernardino y Doña Eduarda Crosas y Graham.

No se ha justificado, según alega la parte demandante, que Don Andrés Crosas comprara con capital perteneciente por

mitad al caudal hereditario de su hermano la participación de Rafael Margari en la liquidación de Margari y Cía. tomando los $20,744 que en efectivo o metálico entregó Crosas a Margari, de los bienes de la Sociedad de Margari y Cía., puesto que según el inventario de los bienes de dicha sociedad hecho en 30 de noviembre de 1877, sólo había en efectivo un capital de $14,419 y por otra parte, en las cuentas pasadas a la Sucesión de Don Eduardo Crosas por Don Andrés Crosas y por Crosas y Finlay, no aparece cargo alguno por precio pagado a Don Rafael Margari.

Ciertamente que en la venta de que se trata, figura el solar número 16, cuyo valor de $258 fué descontado del precio de $21,000 por haberlo exigido así el comprador; pero la verdadera índole jurídica de ese hecho es la de una adjudicación hecha a un socio interesado en la liquidación de una pertenencia de ella por el valor de la tasación que figuró en el inventario final de la sociedad.

Habría el propósito por parte de Don Andrés Crosas de que la sucesión de su hermano figurase como compradora; pero en realidad no llegó a verificarse una compraventa perfecta por parte de la sucesión mediante el concurso de los elementos integrantes de todo contrato que enumera el artículo 1261 del Código Civil antiguo, reproducido con el número 1228 por el revisado.

El contrato de compraventa sí se verificó por Don Andrés Crosas y Don Rafael Margari con todos los requisitos que marcan los artículos citados, pues hubo consentimiento por parte de los contratantes, objeto cierto materia del contrato que es la participación de Margari en la liquidación de Margari y Cía. y causa de la obligación consistente en el pago del precio convenido, y entrega de esa participación. Buena prueba de ello es la escritura de 15 de diciembre de 1877 a la que tenemos que sujetarnos por no haberse demostrado la simulación alegada, prueba que incumbía a la parte demandante, con arreglo al artículo 108 de la Ley para reglamentar la

presentación de evidencia en los procedimientos civiles, apro-
bada en 9 de marzo de 1905.

En cuanto a la escritura de 28 de abril de 1880 y a las
otras dos de 29 del mismo abril, relativas a la ·venta por
Margari a Crosas y Finlay de los tres solares números 6, 11
·y 12 radicados en el barrio de la Marina de esta ciudad, ale-
gan los demandantes en su demanda que Don Andrés Cro-
sas simuló comprar a Rafael Margari para la sociedad mer-
cantil Crosas y Finlay de la que era socio gestor, los expre-
sados solares y los inscribió en nombre de dicha sociedad en
el registro de la propiedad, cuando a los fingidos comprador
y vendedor les constaba que tales solares eran de la exclusiva
propiedad de la liquidación de Margari y Cía., a cuya sociedad
los había aportado el vendedor y de la que desde su principio
formaba parte el comprador.

A esa alegación contestó la representación de la parte
demandada, que en 28 de abril de 1880 Don Andrés Crosas,
liquidador de Margari y Cía. convino en vender los solares 6,
11 y 12 procedentes de la liquidación de Margari y Cía. a la
sociedad Crosas y Finlay, pero como esos solares aparecían en
sus escrituras de adquisición a nombre de Rafael Margari
por más que pertenecían a la Sociedad Margari y Cía., fué
preciso para dar forma legal a las transmisiones que el mismo
Don Rafael Margari hiciese el traspaso o venta de los solares
a Crosas y Finlay, como así lo hizo Don Rafael Margari me-
diante el otorgamiento de las escrituras de que se deja hecho
mérito.

Don Andrés Crosas en la declaración jurada prestada en
el juicio, amplía la anterior alegación explicando que la so-
ciedad de Crosas y Finlay de que eran únicos socios Don An-
drés Crosas y Don Jorge Finlay, siendo también Crosas liqui-
dador único de Margari y Cía., aunque auxiliado y amparado
por Crosas y Finlay, compró las existencias de Margari y Cía.
con inclusión de los solares 6, 11 y 12, pasando éstos, por tanto,
a ser propiedad de Crosas y Finlay, los que pagaron el im-

porte que debían satisfacer por los solares, el que fué abonado a la cuenta de Margari y Cía.

Las alegaciones de Don Andrés Crosas aparecen justificadas por el examen de la cuenta de Margari y Cía. obrante en el récord y que fué abierta a dicha sociedad en los libros de Crosas y Finlay, de los que aparece que el importe de la venta de los tres solares ingresó en el haber de la liquidación para ser distribuído luego, como lo fué entre los partícipes de Margari y Cía. En el balance inventario de Crosas y Finlay de 1878 y en el activo de la misma sociedad figuran dichos solares, los que pasaron luego a Don Andrés Crosas en 1890 cuando por virtud de la disolución de Crosas y Finlay, Don Andrés Crosas adquirió todos los bienes muebles e inmuebles de Crosas y Finlay, entre ellos los repetidos solares con excepción de la hacienda "Santa Bárbara", según escritura de 10 de diciembre del año expresado. Cierto es que Don Rafael Margari no vendió los solares de que se trata a Crosas y Finlay, y realmente no podía vendérselos, pues su propiedad exclusiva no le correspondía; pero como es un hecho positivo que los solares pertenecían a Margari y Cía. aunque figuraban a nombre de Don Rafael Margari y que Margari y Cía. en liquidación, vendió dichos solares a Crosas y Finlay, no vemos dificultad alguna en que en vez de traspasar los títulos de propiedad de los solares Rafael Margari a Margari y Cía. para que esa sociedad a su vez los traspasara a Crosas y Finlay, se hiciera directamente el traspaso en ahorro de gastos y de tiempo por Rafael Margari a Crosas y Finlay como así se hizo sin sufrir con ello perjuicio alguno la Sucesión de Don Eduardo Crosas, pues para ella era lo mismo, siendo como eran, los solares de Crosas y Finlay que Rafael Margari otorgara a favor de éstos las escrituras de propiedad de los mismos o que otorgara esas escrituras a favor de Margari y Cía. para que esta sociedad las otorgara a su vez a Crosas y Finlay.

### TERCER MOTIVO DEL RECURSO.

Alégase como razón de dicho motivo que la corte inferior procediendo erróneamente, declaró válido el nombramiento de tutor testamentario hecho por un apoderado comisario que no tenía poder para ello, cuyo nombramiento es el de tutor y curador *ad bona* de Doña Eduarda Crosas y Graham, con relevación de fianza y frutos por pensión hecho por el comisario Don Andrés Crosas a favor de sí mismo, y cítase como infringida la ley 31 de Toro que es la ley primera, título 19, libro 10 de la Novísima Recopilación, que dice así:

"Porque muchas veces acaece que algunos porque no pueden o porque no quieren facer sus testamentos dan poder a otros que los fagan por ellos; e los tales comisarios facen muchos fraudes y engaños con los tales poderes, extendiéndose a más de la voluntad de aquellos que se lo dan: por ende para evitar los dichos daños, ordenamos e mandamos que de aquí adelante el tal comisario no pueda por virtud de tal poder hacer heredero en los bienes del testador, ni mejoría del tercio ni de quinto, ni desheredar a ninguno de los hijos, o descendientes del testador, ni les pueda substituir vulgar ni pupilar ni ejemplarmente, ni hacerles substitución alguna de cualquier calidad que sea, ni pueda dar tutor a ninguno de los hijos o descendientes del testador, salvo si el que le dió el tal poder para hacer testamento *especialmente le dió el tal poder para facer alguna cosa de las susodichas:* en esta manera el poder para facer heredero nombrando el que da el poder por su nombre a quien manda que el comisario faga heredero y en cuanto a las otras cosas *señalando para qué le da el poder,* y en tal caso el comisario puede hacer lo que especialmente el que le dió el poder señaló e mandó, y no más."

Bajo el hecho número 3, hemos insertado las cláusulas pertinentes del poder para testar que en 4 de noviembre de 1877 otorgó Don Eduardo Crosas a favor de su hermano Don Andrés.

En la cláusula tercera de dicho poder, según dejamos consignado, Don Eduardo Crosas nombró tutor y curador *ad bona* de su hijo Andrés Bernardino Crosas, entonces como de seis meses de edad, a Don Andrés Crosas con relevación de toda

fianza consignándole frutos por pensión. En esa cláusula ni en ninguna otra del poder se faculta a Don Andrés Crosas para nombrarse tutor de Don Andrés Bernardino Crosas, sino que el poderdante, hace desde luego tal nombramiento, y así lo entendió Don Andrés Crosas al otorgar en 14 de enero de 1881 el testamento de su hermano ejercitando el poder que le había sido conferido, pues en la cláusula tercera de ese testamento consigna expresamente Don Andrés Crosas que su poderdante le nombró tutor y curador *ad bona* de su legítimo hijo Don Andrés Bernardino Crosas y Graham. No obstante la carencia de la facultad expresada, Don Andrés Crosas. en la misma cláusula tercera, cumpliendo, según dice, la voluntad expresa de Don Eduardo Crosas y por virtud de las instrucciones terminantes que le comunicó para el caso, hizo extensivo el nombramiento de tutor y curador *ad bona* de Don Andrés Bernardino Crosas hecho a su favor por Don Eduardo, para serlo también de la otra hija de éste, Doña Eduarda Crosas Graham con la propia relevación de fianza y frutos por pensión.

Según la Ley transcrita, para que Don Andrés Crosas hubiera podido verificar el nombramiento de tutor y curador *ad bona* de Doña Eduarda Crosas esa necesario que en el poder se le hubiera conferido facultad especial para hacer nombramiento de tutor y curador *ad bona* y tal facultad, como hemos dicho, no le fué conferida a Don Andrés Crosas.

Y no basta para legalizar el nombramiento de tutor y curador *ad bona* de Doña Eduarda Crosas y Graham hecho por Don Andrés Crosas a favor de sí mismo, el que éste al proceder así cumpliera, según dice, la voluntad expresa de Don Eduardo y obrara por virtud de las instrucciones terminantes que le comunicara, pues el poder no muestra tal voluntad y las instrucciones, si existieron, debieron consignarse expresamente en el poder para que así tuvieran eficacia legal y quedara cumplida la ley transcrita, llenándose los fines de la misma.

Y lejos de contradecirla, viene en apoyo de nuestra opi-

nión la sentencia del Tribunal Supremo de España de 19 de septiembre de 1863 que en su favor invoca la parte recurrida.

El nombramiento, pues, de tutor y curador *ad bona* de Doña Eduarda Crosas y Graham fué ilegal como contrario a ley 31 de Toro; pero como Don Andrés Crosas en concepto de tutor de la menor Doña Eduarda, no intervino en la partición de los bienes de Don Eduardo, aquella ilegalidad no afectó dicha partición y ésta por tanto quedaría eficaz en derecho si otros motivos no la anularan, careciendo así de finalidad práctica la declaratoria de nulidad del nombramiento de tutor y curador de que se trata.

### CUARTO MOTIVO DEL RECURSO.

El discernimiento de la tutela de Don Andrés Bernardino y Doña Eduarda Crosas y Graham a favor de Don Andrés Crosas, con relevación de fianza y frutos por pensión, cuyo discernimiento se impugna por ilegal, es el cuarto motivo del recurso, en cuyo apoyo se invocan por falta de aplicación los artículos 1261, 1269 y 1270 del Código de Enjuiciamiento Civil de España del año 1855 que comenzó a regir en esta isla en 1º de junio de 1866.

Los artículos citados dicen así:

"Artículo 1261. Antes de hacer el juez el discernimiento de todo cargo de tutor, curador para los bienes o ejemplar, teniendo en consideración la entidad del caudal del menor o incapacitado y las circunstancias de su persona, y oyendo siempre al promotor, determinará si se entiende el desempeño del cargo fruto por pensión.

"Caso de no declararse que se entienda en dicha forma señalará el mismo juez lo que el menor deba consumir en sus alimentos y educación, y el tanto por ciento que haya de abonarse por la administración.

"Artículo 1269. Cumplido cuanto queda dispuesto en los artículos que preceden, se exigirá al nombrado que otorgue en el mismo expediente la oportuna obligación a desempeñar bien y fielmente los deberes de su cargo bajo la responsabilidad que las leyes imponen.

"Artículo 1270. Otorgada dicha obligación se extenderá enseguida la diligencia de discernimiento, en la cual el juez dará facultades al nombrarlo para representar al menor con arreglo a las prescripciones legales, y para cuidar de su persona y bienes."

Dice la parte apelante que antes de discernirse a Don Andrés Crosas por el Juzgado de 1ª. Instancia del Distrito de Catedral de San Juan en 28 de mayo del año 1881, el cargo de tutor de los menores Crosas, no se cumplió con ninguno de los requisitos exigidos por la ley, pues ni se investigó la entidad del caudal de los menores, ni sus circunstancias personales, ni se oyó al promotor, ni se determinó por el juez si la tutela se entendía fruto por pensión, ni se exigió al tutor obligación de desempeñar bien y fielmente su cargo.

Ciertamente que no se dió cumplimiento a los preceptos del artículo 1261, pero tampoco ello era necesario en un caso como el presente en que el tutor no había de prestar fianza por haber sido relevado de ella y el desempeño del cargo había de entenderse fruto por pensión.

No aparece que Don Andrés Crosas otorgara en el mismo expediente, obligación de desempeñar bien y fielmente los deberes de su cargo bajo la responsabilidad que las leyes imponen; pero la falta de ese requisito, que no puede calificarse de sustancial o esencial, no vicia de nulidad el discernimiento, pues al solicitarlo Don Andrés Crosas, claro es que aceptaba el cargo con todas sus consecuencias, y por tanto, con la obligación de llenarlo bien y fielmente, cuya obligación en todo caso le hubiera sido exigible con arreglo a la ley. Porque Crosas dejara de prestar esa obligación no había de gozar de impunidad en el ejercicio de la tutela.

De todos modos, repetimos lo que hemos dicho antes al considerar el anterior motivo del recurso o sea que Don Andrés Crosas no intervino en la divisoria de los bienes de Don Eduardo Crosas como tutor de los menores hijos de éste, y por tanto, las formalidades legales que dejaran de cumplirse, sean cuales fueren, al discernirle el cargo de tutor no pueden afectar dicha divisoria en la que intervino Don Benigno

Trueba como curador *ad litem* de los menores Crosas y Graham.

QUINTO MOTIVO DEL RECURSO.

En la exposición del presente motivo se impugna la representación de Don Benigno Trueba como curador *ad litem* de los menores Don Andrés Bernardino Crosas y Doña Eduarda Crosas y Graham, por haberse infringido los preceptos legales atinentes al caso en el nombramiento y discernimiento del cargo de curador *ad litem* de que se deja hecho mérito.

En apoyo de sus alegaciones invoca la parte recurrente los artículos 1851, 1852, 1854 y 1859 del Código de Enjuiciamiento Civil que comenzó a regir en esta Isla en 1º. de enero de 1886 a virtud de Real Decreto de 25 de septiembre de 1885.

Esos artículos dicen así:

"Artículo 1851. Los menores de 25 años que se hallen bajo la *patria potestad* serán representados en juicio por las personas que los tengan bajo su poder.

"Los que no estén sujetos a la *patria potestad* lo serán por sus tutores o curadores.

"Artículo 1852. En el caso de que los padres del menor sujeto a la *patria potestad* o sus tutores o curadores no puedan representarlos en juicio con arreglo a las leyes, se procederá a nombrarles un curador para pleitos.

"Lo mismo se hará si el menor o incapacitado no tuviera nombrado tutor o curador.

"Artículo 1854. El juez hará el nombramiento de curador para pleitos en un pariente inmediato del menor, si lo hubiere; en su defecto, en persona de su intimidad o la de sus padres; y no habiéndolas, o no teniendo la aptitud legal necesaria, en persona de su confianza que la tenga.

"Artículo 1859.—La representación del curador para pleitos cesará luego que se haya nombrado al menor o incapacitado, tutor o curador para bienes o ejemplar o haya desaparecido la incapacidad para representarlos."

No encontramos que los preceptos legáles que dejamos transcritos hayan sido infringidos en el presente caso.

Don Andrés Crosas como tutor de los menores Don Andrés Bernardino y Doña Eduarda Crosas y Graham, era el llamado a representarlos con arreglo al artículo 1851 que dejamos transcrito, pero como el Don Andrés no podía llevar la representación de dichos menores en la testamentaría de su hermano Don Eduardo por ser incompatibles los intereses del uno y de los otros, según lo demuestra la simple lectura de las operaciones divisorias, se hizo necesario dar cumplimiento al precepto del artículo 1852, verificando el nombramiento de un curador *ad litem*.

Don Andrés Crosas de hecho era tutor de los menores Don Andrés Bernardino y Doña Eduarda Crosas y después que le fué discernido el cargo, debía continuar desempeñándolo mientras no cesara en el mismo por alguna de las causas que extinguen la tutela o se decretara su separación por autoridad judicial competente.

Inoportuna y tardía es la impugnación del discernimiento del cargo de curador *ad litem* de los menores Andrés Bernardino y Doña Eduarda Crosas a favor de Don Benigno Trueba, cuando ya éste ha desempeñado ese cargo interviniendo en la divisoria de los bienes de Don Eduardo Crosas y cesando en el mismo después que fué aprobada dicha divisoria. Ilegal también es esa impugnación en la forma en que se hace o sea, sin audiencia del interesado y con infracción del artículo 1878 del código que invoca la parte recurrente, cuyo artículo preceptúa que los tutores y curadores, ya sean para bienes, ya para pleitos, no pueden ser removidos por un acto de jurisdicción voluntaria, aun cuando sea a solicitud de los menores, y que para decretar su separación después de discernido el cargo, será indispensable oirlos y vencerlos en juicio.

Si Don Benigno Trueba no era el llamado al desempeño de la curatela *ad litem* de dichos menores, debió impugnarse su nombramiento antes de serle discernido el cargo, o después de discernido éste, debió solicitarse su remoción, oyén-

dolo y venciéndolo en juicio, lo que nadie ha hecho; y antes por el contrario, tanto Doña Elena Graham, representada por su apoderado Don Miguel Sainz, como la misma abuela de los menores Don Andrés Bernardino y Doña Eduarda, lejos de impugnar, aceptaron dicha curatela al comparecer con Don Andrés Crosas y Don Benigno Trueba ante el Juzgado de Catedral para que fuera aprobada la divisoria de bienes de Don Eduardo Crosas.

Además la curatela *ad litem* de Don Benigno Trueba terminó con la aprobación de la divisoria y hoy carece de finalidad solicitar la nulidad del discernimiento de esa curatela, pues si no procedió bien y fielmente en el desempeño del cargo, remedio otorgaba y otorga la ley a los menores para exigir a Trueba la responsabilidad consiguiente.

### SEXTO MOTIVO DEL RECURSO.

Fúndase ese motivo en que la partición de herencia no fué aprobada legítimamente por los interesados, pues ni Don Miguel Sainz tenía poder bastante para ello de Doña Elena Graham ni Don Benigno Trueba podía llamarse curador *ad litem* de Don Andrés Bernardino y Doña Eduarda Crosas y Graham por no haberse ajustado a derecho el nombramiento y discernimiento de dicho cargo; y se funda también en que dicha partición de herencia se basaba en supuestos falsos, pues falso era que fuera imposible hacer efectiva la deuda de Skerret Hermanos y Cía. a favor de Don Eduardo Crosas; falso también que fuera preciso recibir en pago de dicha deuda 100 cuerdas de terreno de la hacienda "Julita" y cinco pagarés, dos de ellos por $3,500 y los restantes por $3,000 cada uno a vencer en 22 de diciembre de 1887, 1888, 1889, 1890 y 1891; falso igualmente que sólo fuese de una tercera parte lo que correspondió a la Sucesión de Don Eduardo Crosas en la liquidación de Margari y Cía.; y falso del propio modo y nulo en su contenido el convenio del albacea con el representante de los interesados en la herencia

sobre cesión de una mitad de la participación en la liquidación de Margari y Cía. por los pagarés que se dejan expresados, pues la mitad de la tercera parte de Margari y Cía. era de la Sucesión de Don Eduardo Crosas a virtud de la venta que de su tercera parte hizo Margari a Don Andrés Crosas por cuenta de éste y de su hermano Don Eduardo, y los cinco pagarés eran también de dicha sucesión, por proceder de la venta de la hacienda "Cocos" que Don Andrés adquirió para la sucesión y que luego vendió a Don Carlos y Don Emilio Just y Jensen.

En relación con el sexto motivo del recurso, debemos hacer constar que entre las alegaciones fundamentales de la demanda figuran las siguientes:

"Primera. La de que no siendo posible a los demandantes fijar de modo preciso el número y valor de los bienes relictos por Don Eduardo Crosas por encontrarse en poder del demandado Don Andrés toda la documentación atinente al caso, afirman, sin perjuicio de lo que arrojen los libros y documentos particulares de dicho Eduardo E. Crosas y de la Compañía Mercantil Margari & Co. de que formaba parte, que el valor de dichos bienes asciende a cantidades superiores a las siguientes:

| | |
|---|---:|
| Efectivo metálico | $27, 525. 00 |
| Muebles y semovientes | 2, 000. 00 |
| Créditos | 34, 686. 82 |
| Inmuebles | 2, 250. 00 |
| Participación de una mitad en el capital y ganancias de Margari & Co | 38, 875. 91 |
| Total | $105, 337. 73 |

"Segunda. La de que incautado Don Andrés Crosas de todos los bienes y documentos de su hermano Eduardo, se ha apropiado una gran parte del caudal hereditario del mismo por varios medios entre éstos los siguientes:

" (a) * * *.

" (b) Compra en su exclusivo nombre con dinero del caudal hereditario por precio recibido de $15,000 una hacienda en el término de Río Grande denominada 'Cocos' y después la vende igualmente en su propio nombre por precio de $25,000 a Carlos y Emilio Just.

"(*c*) Cede por $30,186.82 moneda mejicana que recibe en efectivo, un crédito hipotecario por dicha cantidad, pero oro americano, e intereses de 12 por ciento anual que el caudal hereditario tenía contra Skerret Hermanos y Cía.

"(*d*) *   *   *.

"(*e*) Da a préstamo en nombre propio a Nicolás Ordaz o a Isabel Sampayo su esposa $12,525 del caudal hereditario y lo salda recibiendo en pago en su nombre cien cuerdas de una hacienda denominada 'Julita' sita en el término de Dorado.

"(*f*) Inscribe a su propio exclusivo nombre la posesión de dos terceras partes de las casas número 40 y número 8 de las calles de la Luna y San José de esta capital, cuando una de esas terceras partes correspondía al caudal hereditario tantas veces referido.

"(*g*) Lleva a cabo una partición de los bienes relictos a la muerte de Eduardo E. Crosas y en la declaración de esos bienes aparecen excluídos del caudal hereditario los $30,186.82 de la cesión del crédito hipotecario contra Skerret Hermanos y Cía. y los 25,000 de la venta de la "Cocos," declarando además incobrable desde su fecha el pagaré contra Manuel Barasoaín y su esposa, lo que no era cierto.

"(*h*) En esa misma partición se reconoce al albacea un crédito de $4,307.83 y a Crosas y Finlay otro de $15.081.42 que no se les debía y para su pago se les adjudica dinero efectivo."

En cuanto a la alegación de que Don Miguel Sainz no tenía poder bastante de Doña Elena Graham para representarla en la divisoria de los bienes de Don Eduardo Crosas, traigamos a examen el poder de que hizo uso Sainz otorgado en la ciudad, Condado y Estado de New York en 13 de diciembre de 1886, en cuyo documento dice Doña Elena lo siguiente:

"Que daba, confería y por la presente da y confiere todo su poder, amplio, cumplido, bastante, cuanto en derecho se requiera y fuere necesario a Don Miguel Sainz, mayor de edad y vecino de la ciudad de Puerto Rico, isla de Puerto Rico, para que representando a la otorgante, sus derechos y acciones, promueva por todos los trámites legales la testamentaría de su difunto esposo el expresado Don Eduardo E. Crosas exigiendo de Don Andrés Crosas en su carácter del albacea de su referido esposo, otorgue el testamento que éste le autorizó hiciera en virtud del poder que al efecto le confirió por ante el Notario Don Demetrio Jiménez y Moreno en la ciudad de Puerto Rico el

día cuatro de noviembre de 1877, declarando los bienes en que consistía o consiste el haber hereditario dejado por su dicho esposo, señalando los que pertenezcan a la compareciente por su mitad de gananciales y los que pertenezcan a sus hijos Don Andrés Bernardino y Doña María Eduarda Crosas, habidos en su matrimonio con su referido esposo; para que exija e intervenga en la formación del inventario, avalúo y la presentación de las cuentas juradas de adjudicación, partición y división de dichos bienes, entre la otorgante y sus referidos hijos, en virtud de lo dispuesto por el testador, para que exija las cuentas del albaceazgo y cualquiera otras que deban darse, las examine y apruebe y tache, intervenga en los nombramientos de tasadores, depositarios y peritos que avalúe el haber hereditario y en general practique todos los actos y diligencias que le sean inherentes hasta el completo término de dicho juicio testamentario. Para que acepte, cobre y perciba y tome posesión, pero bajo beneficio de inventario los bienes que le toquen, correspondan o se le adjudiquen a la otorgante, dando y otorgando los recibos, cartas de pago, escrituras y demás documentos que se requieran; para que haga inscribir los inmuebles en los registros de la propiedad de los partidos en que los mismos se radiquen, así como también todos los documentos que a ellos sean concernientes, firmando las relaciones e inventarios, expedientes posesorios, notas adicionales, solicitudes y demás que se requieran, practicando las gestiones que sean menester; para que comparezca en juicio, si fuera necesario, asistido de los letrados y procuradores que nombre ante los tribunales, audiencias y autoridades competentes, etc.''

Como se ve, Doña Elena Graham apoderó a Don Miguel Sainz para que representando sus derechos y acciones, promoviera por todos los trámites legales la testamentaría de su difunto esposo y en general practicara todos los actos y diligencias que le fueran inherentes hasta el completo término de dicho juicio testamentario.

''Por testamentaría, voz derivada de testamento, dice Don José María Manresa y Navarro en sus Comentarios a la Ley de Enjuiciamiento Civil española, se entiende todo lo que se refiere a la ejecución de las últimas voluntades: así es que se da este nombre a la reunión de los albaceas testamentarios: al conjunto de documentos y demás papeles que son necesarios para dar cumplimiento a la voluntad del testador,

a las diligencias y operaciones que extrajudicial y privadamente practican los ejecutores testamentarios o los mismos herederos para el inventario, avalúo, pago de deudas y legados, liquidación y división de la herencia, y para la ejecución de lo demás que haya ordenado el testador; y por último, a las actuaciones judiciales que con este mismo objeto se promuevan alguna vez de oficio, y otras veces a instancia de parte legítima."

Habiendo Doña Elena Graham apoderado a Don Miguel Sainz para que la representara en la testamentaría de Don Eduardo E. Crosas, claro es que lo apoderó para que llevara su representación, ya se arreglara la testamentaría judicialmente, ya extrajudicialmente. La promoción de la testamentaría por todos los trámites legales no significa que hubieran de llenarse por Sainz todos los trámites de un juicio testamentario, sino en el caso de que Sainz lo estimara necesario, máxime si se tiene en cuenta que en el poder para testar, otorgado a favor de Don Andrés Crosas por su hermano Don Eduardo en 8 de noviembre de 1877, ordenó éste se procediera extrajudicialmente y no de otra suerte que prohibe al arreglo de su testamentaría.

Los trámites legales que habrían de llenarse, eran los ordenados por la ley, según que el arreglo fuera judicial o extrajudicial, reservándose el juicio testamentario en forma sólo para el caso de que los intereses de Doña Elena lo exigieran; y tan es así, que en el poder se autoriza a Sainz para que comparezca en juicio, si fuera necesario.

No era, pues, el propósito decidido de Doña Elena Graham que la testamentaría de su esposa se arreglara judicialmente, sino en el caso de que fuera necesario.

Pero si se estimara que el poder de Doña Elena Graham a Sainz no era bastante para el arreglo extrajudicial de la divisoria de bienes de Don Eduardo, siempre Doña Elena Graham estaría impedida de impugnar la validez de dicha divisoria por el motivo expresado, pues ella misma dice en su declaración jurada que estuvo conforme con la partición

de los bienes de su esposo cuando Sainz le indicó que lo estuviera, y además confiesa haber enviado a su apoderado una memoria en que expresaba sus juicios y opiniones acerca de los asuntos de la Sucesión de Don Eduardo para el ejercicio del poder. Hoy no puede ir contra sus propios actos.

En cuanto a la falta de representación de Don Benigno Trueba como curador *ad litem* de los menores Don Andrés Bernardino y Doña Eduarda, para aprobar la divisoria de los bienes de Don Eduardo Crosas, nos referimos a lo que dejamos expuesto al examinar el quinto motivo del recurso. No cabe dudar de la representación legal de Don Benigno Trueba en el concepto indicado.

Pasemos ahora al examen y consideración de los supuestos que la representación de la parte apelante califica de falsos y que fueron establecidos por Don Andrés Crosas como base para la divisoria de bienes, cuya nulidad se solicita.

Al estudiar el segundo motivo del recurso, dejamos establecido que Don Andrés Crosas, sean cuales fuesen los propósitos que él y su hermano Don Eduardo abrigaran de comprar la participación de Don Rafael Margari en la Sociedad Margari y Cía., tal compra real y positivamente sólo se hizo por y para Don Andrés, mediante escritura pública de 15 de diciembre de 1877, y por tanto, la Sucesión de Don Eduardo Crosas a virtud de esa compra, no adquirió derecho alguno sobre la mitad de la tercera parte que correspondió a Don Rafael Margari en la liquidación de Margari y Cía.

Si hubiéramos de atenernos a los hechos consignados en la presente opinión bajo los números 8º. y 11º. concernientes al reconocimiento de un crédito hipotecario de $30,186.82 en escritura pública de 25 de mayo de 1878 por la Sociedad Agrícola Skerret Hermanos y Cía. a favor de la Sucesión de Don Eduardo Crosas y a la venta de ese crédito en pública subasta, el que fué adjudicado el 12 de agosto de 1881 a Don Nicolás Ordaz, pagando éste su total importe a Don Andrés Crosas en moneda de plata mejicana, y relacionáramos esos hechos con el contenido de otra escritura pública de 31 de

agosto de 1883 a que nos hemos referido bajo el número 15 de los hechos consignados en nuestra opinión, por cuya escritura Doña Isabel Sampayo, viuda de Don Nicolás Ordaz, cedió a Don Andrés Crosas un trozo de 100 cuerdas de la Hacienda "Julita" en pago de una deuda de $12,523, fácilmente llegaríamos a la conclusión de ser falso que fuera imposible hacer efectiva la deuda Skerret Hermanos y Cía., por valor de $30,186.82 y falso también que fuera preciso recibir en pago de dicha deuda 100 cuerdas de terreno de la hacienda "Julita" y 5 pagarés, dos de ellos por $3,500 y los restantes por $3,000 cada uno, a vencer en 22 de diciembre de 1887, 1888, 1889, 1890 y 1891, pues si la deuda de Skerret Hermanos había sido extinguida mediante su adjudicación o cesión a Don Nicolás Ordaz por valor recibido en moneda de plata mejicana, no pudo ser pagada con 100 cuerdas de terreno de la hacienda "Julita" y los cinco pagarés de que se deja hecho mérito.

Y la falsedad resultaría más, trayendo a colación la escritura pública de 14 de julio de 1881 marcada con el número 12 de los hechos que dejamos relacionados por la que Skerret Hermanos y Cía. vendió a Don Andrés Crosas un predio rústico denominado "Los Cocos" por precio recibido de $15,000 y relacionando esa escritura con otra de 22 de diciembre de 1883 marcada con el número 13, por la que Don Andrés Crosas vendió a Don Carlos y Don Emilio Just y Jensen el mismo predio "Cocos" por precio de $25,000 o sean $6,000 recibidos en metálico por el vendedor, y los $19,000 restantes a pagar en 6 plazos distintos que habían de vencer en 22 de diciembre de los años de 1886, 1887, 1888, 1889, 1890 y 1891, el primero, cuarto, quinto y sexto plazos de $3,000, y el segundo y tercer plazos de $3,500, con garantía hipotecaria por todo el precio aplazado.

Parece que los cinco pagarés últimos de los relacionados, atendida la identidad de sus valores, y la de las fechas de su vencimiento, son los mismos que, según la divisoria de bienes de Don Eduardo Crosas, pertenecen a la sucesión de éste. y

que Don Andrés recibió en cambio de la mitad de la participación de Don Rafael Margari en Margari y Cía., según convenio con los interesados. Y nos inclinamos a creerlo así, por la razón de que no obstante la escritura de venta del predio rústico "Cocos" por Skerret Hermanos y Cía. a Don Andrés Crosas sin la menor intervención por parte de la Sucesión de Don Eduardo Crosas, el Don Andrés, en unión de copias de otras cuentas, entregó a Don Miguel Sainz, como apoderado de Doña Elena Graham, para su examen, copia de la cuenta de la estancia "Cocos" y también presentó esa cuenta con otras para su aprobación con la divisoria de los bienes de Don Eduardo Crosas, cual si la estancia "Cocos" hubiera sido comprada para la Sucesión de Don Eduardo Crosas.

En corroboración de lo que acabamos de indicar, ocurre la particularidad de que en carta de 1º. de septiembre de 1882, Don Andrés Crosas dice a su cuñada Doña Elena Graham entre otras cosas lo siguiente:

"Dígale a Andresito que como a él le gusta el campo, que yo le tengo aquí una finca de más de 600 cuerdas con más de 200 cabezas de ganabo, 12 caballos y yeguas, en la cual siembro arroz, maíz, cocos, papas de todas clases y tabaco fino. Dos grandes ríos forman su colindancia. Cuando él sea hombre puede venir y trabajarla, pues haría una magnífica hacienda de caña, pero él tiene que ser un buen muchacho, no perezoso y estudiar mucho."

Don Andrés Crosas reconoce que esa carta se refiere a la hacienda "Cocos" y con ella se proponía estimular a su sobrino a que estudiase sin contraer obligación de cumplir lo que ofrecía.

No hemos de deducir, empero, que no obstante figurar en documento público la estancia "Cocos" como de la propiedad de Don Andrés Crosas, perteneciera realmente a la sucesión de su hermano Don Eduardo y en su consecuencia también el producto de la venta de la misma que Don Andrés Crosas hizo a Don Carlos y Don Emilio Just y Jensen, pues otros elementos probatorios aportados al juicio, nos impiden llegar a seme-

jante conclusión así como a la de que fuera de la propiedad exclusiva de la Sucesión de Don Eduardo Crosas el crédito de $30,186.82 reconocido por Skerret Hermanos y Cía. a favor de dicha sucesión por escritura pública de 25 de mayo de 1878.

En la alegación 29°. de la contestación a la demanda se hace constar que ''independientemente de la sociedad Margari y Cía., los hermanos Don Eduardo y Don Andrés Crosas tenían un negocio separado consistente en un capital de $30,000 aportados cada uno de por mitad, cuyo capital de $30,000 fué la suma prestada a la Sociedad Agrícola Skerret Hermanos y Cía.''; y Don Andrés Crosas al declarar en el juicio reproduce bajo juramento la afirmación hecha en la demanda y agrega que ese crédito fué satisfecho con la estancia ''Cocos'' y 100 cuerdas de la hacienda ''Julita'' de Skerret Hermanos, las que como más vendibles reservó para Don Eduardo, quedándose el testigo con la ''Cocos'' por la mitad que le correspondía.

En carta de 10 de febrero de 1887, dirigida a su poderdante Doña Elena Graham por Don Miguel Sainz, a cuya carta acompañaba el testamento otorgado por el comisario Don Andrés Crosas y las operaciones divisorias de los bienes de Don Eduardo con varias cuentas que a Sainz había presentado el Don Andrés, entre ellas la de la estancia ''Cocos,'' decía Sainz, cual si le llamara la atención que en la cláusula 4ª. de dicho testamento y en la declaración de bienes de Don Eduardo, figurara una obligación por valor de $30,186.82 reconocida por Skerret Hermanos y Cía. a favor de Don Eduardo Crosas: ''Yo creía que la deuda de Skerret pertenecía por mitad a Eduardo y a Andrés.''

La misma Doña Elena Graham al declarar y teniendo a !a vista el párrafo de la carta de Sainz que dejamos transcrito, dice que ''Aceptaba como cierto que ese crédito pertenecía a los dos hermanos.

Tenemos, pues, que ambas partes convienen en que el crédito de Skerret Hermanos por $30,000 correspondía por mitad a los hermanos Don Andrés y Don Eduardo Crosas.

Y no nos parece admisible como pretende la parte apelante, que ese crédito de $30,000 perteneciente a los hermanos Don Andrés y Don Eduardo Crosas contra Skerret Hermanos y Cía., fuera distinto del otro crédito hipotecario de $30,186.82 reconocido por Skerret Hermanos a favor de la Sucesión de Don Eduardo Crosas por escritura pública de 25 de mayo de 1878 y cedido a Don Nicolás Ordaz mediante adjudicación en pública subasta hecha en 12 de agosto de 1881 y entrega de su montante a Don Andrés Crosas en 5 de septiembre siguiente.

Don Andrés Crosas, al declarar en el juicio, no ha confesado la diversidad de esos créditos; y aun más, en carta dirigida por él mismo a Doña Elena Graham con fecha 15 de octubre de 1882, claramente da a entender que no existían dos créditos distintos, uno hipotecario y otro común a favor de la Sucesión de Don Eduardo Crosas, cuando, entre otras cosas, dice a Doña Elena lo siguiente:

"Ahora hemos llegado a la deuda debida por la Hacienda 'Monserrate' o sea Skerret Hermanos y Co., la cual ha resultado muy mala. Primero, con recibos simples por dinero adelantado a ellos y los cuales, según la ley española, no tienen fuerza alguna sobre el deudor. Yo tuve por algún tiempo que barajármela de tal modo hasta poder yo obtener de ellos un documento público y superior a los otros para el cobro, pero en el principio del año 1878 quebraron y continuaron después hasta 1880 cuando fracasaron por completo. Desde entonces hasta ayer, es decir, dos horas antes de recibir su carta, diariamente he tenido alguna molestia u otra cosa sobre ella, el procedimiento de la ley es largo, despacio y costoso. Por eso yo no iba a botar dinero en un pleito y obtener nada. Por fin después de muchas combinaciones y habiendo tenido que evitar intrigas y muchos obstáculos, fué convenido que yo consiguiese terreno por lo que se debía. Ahora hace cerca de dos años que estamos en eso, pero con el notario, el juez, el abogado, los menores, el registrador y el demonio, no sé que más, he tenido grandes obstáculos; hasta un pleito en el cual figuraba yo privadamente. Ahora estoy casi en la salida, pero en toda probabilidad acabaré en el año que viene, al principio. Al tomar los terrenos tengo un buen comprador para ellos y si él no compra, tengo otro tan bueno. Así es que están los asuntos, sin escribir una historia larga sobre ellos."

El documento público a que en la carta anterior se refiere Don Andrés Crosas, debe ser la escritura de 25 de mayo de 1878, pues no aparece en el récord otro documento de reconocimiento de crédito por Skerret Hermanos y Cía. a favor de la Sucesión de Don Eduardo Crosas, y si ello es así y el crédito reconocido por la escritura de 25 de mayo de 1878 estaba aun sin cobrar en la fecha de la carta o sea en 15 de octubre de 1882, no nos podemos explicar cómo ese mismo crédito pudo ser extinguido en el año anterior o sea en 1881 mediante su adjudicación a Don Nicolás Ordaz y pago por éste a Crosas de su importe.

Que sólo había un crédito de Skerret Hermanos, lo indica también el testamento otorgado por el comisario Don Andrés Crosas a nombre de su hermano en 14 de enero de 1881, pues en la cláusula 4ª. que contiene la declaratoria de bienes del finado, entre éstos no aparecen más créditos que una obligación constante de escritura pública otorgada a favor del Don Eduardo por la Sociedad Skerret Hermanos y Cía. por refacción suministrada a las haciendas "Monserrate," "Julita" y "Carmela" y por la suma de $30,186.82. Esa escritura pública tiene que ser la de 25 de mayo de 1878 a que tantas veces nos hemos referido.

Y resulta contradicción manifiesta entre el hecho consignado en el testamento, de existir a favor de Don Eduardo Crosas la obligación expresada por $30,186.82 y la declaración jurada de Don Andrés Crosas de que el crédito de Skerret Hermanos y Cía. pertenecía por mitad a Don Andrés y a Don Eduardo Crosas.

Parécenos que los terrenos a que se refiere la carta de Doña Elena Graham a Don Andrés Crosas de 15 de octubre de 1882 y que Crosas convino en conseguir de Skerret Hermanos por la deuda que éstos reconocieron en el documento público de 25 de mayo de 1878, son los de la estancia "Cocos" que Don Andrés Crosas adquirió de Skerret Hermanos y Cía. por escritura pública de 14 de julio de 1881 y que luego vendió a Don Carlos y Don Emilio Just y Jensen por otra escritura de 22

de diciembre de 1883; y así se vislumbra en la carta de Andrés Crosas a su cuñada Doña Elena, de 1º. de septiembre de 1882, que parcialmente dejamos transcrita y en el hecho de haberse presentado la cuenta de la estancia "Cocos" a Don Miguel Sainz para su examen en unión de otras cuentas correspondientes a la testamentaría de Don Eduardo Crosas, cuentas todas presentadas al juzgado con la divisoria de los bienes de Don Eduardo Crosas.

Sin embargo, se hace difícil comprender sin darse más explicación, que no se nos ha dado, cómo el crédito de $30,186.82 garantizado con hipoteca pudo saldarse con el importe de los terrenos de la estancia "Cocos" que Don Andrés Crosas, a nombre propio, compró por escritura pública de 14 de julio de 1881 y más difícil aun todavía se hace aceptar que la referida deuda fuera saldada con 100 cuerdas de terreno de la hacienda 'Julita'' que por escritura pública de 31 de agosto de 1883 Doña Isabel Sampayo, viuda de Don Nicolás Ordaz, cedió a Don Andrés Crosas en pago de la deuda de la testamentaría de Don Nicolás Ordaz montante $12,523 y procedente, según dicha escritura, de la cesión que al finado Ordaz hizo Don Andrés Crosas de un crédito contra Skerret Hermanos y Cía.

Y no constando del récord otro crédito cedido por Don Andrés Crosas a Don Nicolás Ordaz que el de Skerret Hermanos y Cía., por valor de $30,186.82 adjudicado o cedido a Ordaz en pública subasta, ocurre preguntar: ¿No sería ese crédito de $12,523 parte o resto del de $30,186.82? En caso afirmativo, ¿cómo es que resulta de actuaciones judiciales pagado el crédito de $30,186.82 por cesión del mismo a Don Nicolás Ordaz?

Llama la atención que el juez no firme la diligencia transcrita en el hecho número 11º. sobre entrega por Ordaz a Crosas de los $30,686.82 en que fué rematado el crédito hipotecario, por más que en dicha diligencia se dice que firma el juez en unión de Ordaz y Crosas por ante el escribano José Ma. San Juan.

El criterio judicial se encuentra perplejo, vacila y duda ante las sombras que envuelven estos autos y con tales vacilaciones y dudas que la parte demandante estaba en el deber de disipar, no es posible que podamos declarar nula la divisoria de bienes de Don Eduardo Crosas, faltando como falta prueba satisfactoria del fraude alegado.

Hemos de admitir, por ser hecho aceptado por ambas partes, que Don Andrés y Don Eduardo Crosas tenían un crédito por $30,000 contra la Sociedad Skerret Hermanos y Cía., por partes iguales, y como no podemos dudar que el capital de ese crédito era manejado por Don Andrés Crosas, llegamos a la conclusión de que había entre los dos hermanos una verdadera comunidad de bienes con relación a dicho crédito y productos del mismo. Esa comunidad fué disuelta por los partícipes interesados en ella, debidamente representados, al practicarse la divisoria de los bienes de Don Eduardo Crosas, mediante la cual desapareció también la comunidad de derechos é intereses que Doña Elena Graham y sus hijos tenían con Don Andrés Crosas en la sociedad Margari y Cía.

Lo convenido en la divisoria practicada sobre la cual recayó aprobación de la autoridad judicial, es ley para Don Andrés Crosas y la Sucesión de Don Eduardo Crosas.

En cuanto a la liquidación de la sociedad Margari y Cía., puede invocarse también el artículo 234 del Código de Comercio, que dice así:

"En la liquidación de sociedades mercantiles en que tengan interés personas menores de edad o incapacitadas, obrarán el padre, madre o tutor de éstas, según los casos, con plenitud de facultades como en negocio propio y serán válidos é irrevocables sin beneficio de restitución todos los actos que dichos representantes otorgaren o consintieren por sus representados sin perjuicio de la responsabilidad que aquellos contraigan para con éstos por haber obrado con dolo o negligencia."

Si los menores hijos de Don Eduardo Crosas quedaron perjudicados por la liquidación de Margari y Cía., bien pudieron reclamar antes o después de llegar a la mayoría de edad

contra su curador *ad litem*, Don Benigno Trueba que estuvo conforme con la parte que se les adjudicó en la liquidación de la sociedad expresada.

No terminaremos la consideración del sexto motivo del recurso sin hacernos cargo de las alegaciones hechas en su demanda por la parte demandante con relación a las casas números 40 y 8 de las calles de la Luna y San José de esta capital, al crédito de $4,307.83 reconocido en la cuenta divisoria a favor del albacea Don Andrés Crosas, y al otro crédito de $15,081.42, reconocido también a favor de Crosas y Finlay en la misma cuenta divisoria.

Efectivamente, Don Eduardo Crosas y sus hermanos Don Andrés y Doña Ana, eran dueños de las dos casas de que se deja hecho mérito por herencia de su padre Don Bernardino, y no obstante, pertenecer una tercera parte de aquéllas a la Sucesión de Don Eduardo Crosas, Don Andrés Crosas y Don Miguel Sainz, viudo de Doña Ana, instruyeron un expediente posesorio en el que manifestaron que tales fincas correspondían, dos terceras partes a Don Andrés, y la otra tercera parte a Doña Ana, expediente que una vez aprobado por la autoridad judicial, sirvió de título para realizar la venta de las expresadas casas; pero aunque en dicho expediente posesorio se desconocieron los derechos de Don Eduardo o de sus herederos, ningún perjuicio sufrieron éstos, pues la tercera parte del precio de la venta que les correspondió, fué abonada al haber de la cuenta corriente de la Sucesión de Don Eduardo E. Crosas que consta en el récord, aparte de que los demandantes no han formulado pedimento alguno sobre nulidad de dicho expediente y venta subsiguiente de aquellas casas.

El crédito a favor de Don Andrés Crosas que figuró en la cuenta divisoria por sumas que le adeudaba la sucesión, ha quedado comprobado en el juicio por la cuenta particular de Don Andrés Crosas y documentos presentados en su corroboración, a lo cual debe agregarse que dicha cuenta no fué impugnada por los demandantes al aprobar la divisoria de los bienes de Don Eduardo Crosas. Y en cuanto al otro

crédito de Crosas y Finlay, quedó también probada su existencia por la cuenta de Crosas y Finlay con la sucesión de Don Eduardo Crosas, que lo mismo que la anterior, tuvieron a su disposición los interesados, los que lejos de impugnarla la aceptaron admitiendo así la existencia del mencionado crédito.

El pagaré de Barasoaín y consorte que el albacea en la cuenta divisoria, manifiesta haber sido incobrable cuando en realidad no lo era, según alega la parte demandante, venció en 5 de marzo de 1877, atendidos los términos en que aparece redactado el documento, o sea en fecha en que aun vivía Don Eduardo Crosas, y sin embargo, no se cobró por éste. Si el albacea fué negligente en el cobro y por ese motivo se hizo incobrable el documento, tal negligencia podría dar lugar a alguna acción contra Crosas, pero nunca sería la de nulidad de la partición de bienes de su hermano.

Ninguno de los motivos alegados por la parte apelante en apoyo de la nulidad de la cuenta divisoria, sostiene tal nulidad y la resolución de la corte inferior sobre el particular debe sostenerse.

### SÉPTIMO MOTIVO DEL RECURSO

Si la cuenta divisoria de los bienes de Don Eduardo Crosas no puede estimarse nula, es obvio que mediante esa cuenta divisoria quedó disuelta la comunidad de bienes de Don Eduardo Crosas y su hermano Don Andrés en la Sociedad mercantil Margari y Cía. y en el crédito a ambos correspondiente, pues en dicha divisoria se adjudicó a la Sucesión de Don Eduardo Crosas en metálico la participación que por ambos conceptos le correspondía.

La corte inferior procedió con arreglo a derecho al no ordenar que se llevara a cabo la disolución de una comunidad que ya estaba disuelta por la cuenta divisoria, y la falta de declaración expresa sobre ese particular no constituye defecto alguno ni sustancial, ni de procedimiento.

Bien podríamos hacer caso omiso de la excepción de prescripción que subsidiariamente alegó la parte demandante en su contestación a la demanda, ya porque siendo improcedente la acción ejercitada, se hace ocioso discutir su extinción por prescripción, ya porque la parte demandada al impugnar el recurso no hizo alegación alguna, como pudo hacerlo, para que se sostenga la sentencia por el fundamento de la prescripción si hubiera de revocarse por los motivos que en su defensa invoca la parte apelante.

Sin embargo, conviene hagamos constar que tanto los contratos a que se refieren la escritura de 15 de diciembre de 1877, por la que Don Rafael Margari vendió a Don Andrés Crosas·su participación en Margari y Cía. en Liquidación, y las otras tres escrituras de 28 y 29 de abril de 1880, por las que Don Rafael Margari traspasó a Crosas y Finlay la propiedad de los tres solares números 6, 11 y 12 de la Marina de esta ciudad, como las estipulaciones en que convinieron todos los interesados, Don Andrés Crosas por sí, Doña Elena Graham por medio de su apoderado Don Miguel Sainz y los menores Crosas Graham bajo la representación de su curador *ad lítem* Don Benigno Trueba, al aprobar la divisoria de los bienes de Don Eduardo Crosas, tuvieron verdadera existencia, por haber concurrido todos los requisitos que marca el artículo 1228 del Código Civil Revisado—1261 del antiguo, por más que tales contratos y estipulaciones sean anulables, con arreglo al artículo 1267 de nuestro Código—1300 del antiguo; pero la acción de nulidad sólo puede durar cuatro años según ambos cuerpos legales, término que respecto de Doña Elena Graham comenzó a correr desde la fecha de los actos expresados y respecto de los menores, desde que éstos llegaron a la mayoría de edad.   Artículos 1268 del Código Revisado, y 1301 del antiguo.

Como la demanda que originó el presente pleito se formuló en 14 de noviembre de 1908, cuando hacía ya más de cuatro años que los menores Don Andrés y Doña Eduarda Crosas Graham eran mayores de edad, pues el uno nació en

1877 y la otra en 1878, es indudable que la acción para pedir la nulidad de los contratos y estipulaciones de que se deja hecho mérito, si fuera procedente, hubiera prescrito por el transcurso de los cuatro años que la ley señala para su ejercicio, cuyo término es igual al señalado para la rescisión de las particiones.

En mérito de todo lo expuesto debe declararse sin lugar el presente recurso y confirmarse la sentencia apelada que dictó la Corte de Distrito de San Juan en 24 de mayo del año de 1910.

*Confirmada.*

Jueces concurrentes: Sres. Asociados MacLeary y del Toro.

El Juez Asociado Sr. Wolf firmó haciendo constar estar conforme con la sentencia y la opinión, pero sin discutir la prescripción.

El Juez Asociado Sr. Aldrey no tomó parte en la resolución de este caso.